No. 29,492.

THE STATE OF KANSAS, *Appellee*, v. RAYMOND KELLY, *Appellant*.

(291 Pac. 945.)

Opinion filed October 11, 1930.

E. C. Wilcox and J. Howard Wilcox, both of Anthony, for the appellant.

William A. Smith, attorney-general, and Guy Neal, county attorney, for the appellee; Donald Muir, of Anthony, of counsel.

The opinion of the court was delivered by

BURCH, J.: Raymond Kelly was charged with murder in the first degree for the willful, deliberate and premeditated killing of J. Harry Ferril on October 5, 1929. Kelly was convicted of murder in the second degree—that is, murder committed purposely and maliciously, but without deliberation and premeditation—and appeals.

Ferril's house and farm buildings were a few yards north of the Kansas-Oklahoma state. line, and a few yards east of a north-and-south public road extending into both states. Kelly lived about a mile south of the Ferril place, and had a farm north of Ferril's place. Bud Smith, for whom Delmar McClaflin worked, lived south and west of the Ferril place, and Dan Kelly, defendant's father, lived south of Smith's place and north of defendant's home place. Kelly's wife had been intimate with Ferril for some time. She testified at the trial she had been meeting Ferril in towns in Kansas and Oklahoma, she loved him, she had considered leaving her husband for Ferril, and she admitted everything except actual copulation.

The killing occurred on Saturday morning. On the Saturday before, Mrs. Ferril gave birth to a child in a hospital in Cherokee, Okla. Mrs. Kelly was at the hospital, and she said Ferril proposed she should go to a hotel and stay with him in the hotel. On Sunday, Ferril asked Mrs. Kelly to do his washing, and on Monday she went to Ferril's house for that purpose. She was to get her husband's dinner, but Ferril wanted her to do the ironing so she just stayed on and did not get home until night. That night her husband asked her how long that had been going on. On Wednesday morning Ferril was at the Kelly home, and Mrs. Kelly told him to stay away, her husband knew quite a bit. About noon Wednesday Mrs. Kelly confessed everything to her husband. In the afternoon Ferril came, and Mrs. Kelly told him she had confessed to her husband. Ferril came back twice on Thursday and twice on Friday. On Saturday morning Kelly took a shotgun with him, drove up to Ferril's house in an autotruck, found Ferril alone, and shot and killed him.

Ferril's body was found by a woodpile back of his house. He was lying on his back, with his left hand in his left trousers pocket, and his right hand back of his head on the ground. There was a gunshot wound in his left breast. The hole was about the size of a quarter of a dollar, and there were sixteen or eighteen holes scattered about the large wound within a radius of eight or ten inches. A shotgun shell wad with No. 4 chilled shot written on it was found in Ferril's shirt. There were no signs of powder burns, no signs of struggle, and Ferril was unarmed. Search of his pockets revealed a small pocket knife, but the witness who found it did not tell which pocket it was in.

After the killing Kelly started down the road toward his own home. McClaflin, who was shocking corn fodder west of the road, saw Kelly go to Ferril's house. As Kelly came back, McClaflin ran out to the road, stopped Kelly, and asked him for some tobacco or a cigarette. Kelly said he had shot Ferril, and asked McClaflin to go up there and see what could be done for him. Kelly was not excited, said he did it because of family trouble, and told McClaflin he need not call the sheriff, as Kelly was going right home and would do that. These were the frank statements of an avenging husband made within a few minutes after the killing.

There was time for reflection after Kelly left McClaflin and before he reached Dan Kelly's house, and the notion of self-defense arose in Kelly's mind. When he reached his father's house he said he had killed Ferril. His father asked him why he did it, and his father testified Kelly said, "Well, if I hadn't, he would have got me." Concerning this interview, Kelly himself testified he said to his father, "I just figured it was me get him, or he would get me." The result is that within a few minutes after Kelly talked with Mc-Claflin the killing had become the reasoned act of one whose purpose was to kill to save his own life. This explanation was adhered to when Kelly got home. His wife testified he said to his sister Minnie, "It was either me get him, or he would have got me."

A witness who arrived at Kelly's house before the sheriff came testified as follows:

"His sister asked him where Ferril's little boys were, and he said, 'I don't know, I couldn't have done it if they had been there.' She asked, 'Why didn't you think of Grace [Ferril's wife] and the children?' and he said, 'I did, that is the reason I waited this long.'"

Kelly telephoned the sheriff of Alfalfa county, Oklahoma, who came out and took Kelly to Cherokee. Kelly told the sheriff he had shot a man, it was family trouble, and Ferril had not tried to get away because Ferril did not know Kelly was going to shoot. Kelly himself testified he told the sheriff Ferril did not try to get away because Ferril did not know Kelly was going to shoot. The result was, Kelly had greatly damaged the self-defense explanation of the killing before the time arrived for him to make effective use of it. The explanation never did fit the killing of an unarmed man by shooting him in the heart with a shotgun fired from a distance, and Kelly did not repeat on the witness stand the statements made to Dan Kelly and at his own home, to the effect he figured it was

Kelly get Ferril or Ferril would get Kelly. The following is an abridgment of Kelly's story of the killing, so far as it relates to the defense of self-defense.

While Kelly was driving northward along the road, Ferril walked out from the northwest corner of his house, and motioned to Kelly to come in. The driveway from the north-and-south road into Ferril's premises led almost directly north past the west side of the dwelling house to the garage. There was a driveway to the right, passing the front, the east side, and the north end of the house, and Kelly took that course. Kelly stopped the autotruck at the east side of the house. Kelly sat in the truck, and conversed with Ferril in a commonplace way for some time. Then Ferril said there seemed to be something wrong with Kelly. Kelly said there was, and Ferril knew what it was. Kelly said he knew quite a bit. Ferril said he didn't know what made Kelly think things like that, and Kelly said he could hardly believe them either. The gun was in the truck, and Ferril stood beside the truck. Ferril looked out toward the woodpile twice, and said something had been getting his chickens, and he believed he would go and see if he could get it. Kelly took the gun out of the truck, and the two men started toward the woodpile, fifty or sixty feet away, with Ferril in the lead. On the way Ferril twice asked for the gun, but Kelly kept it. When near the woodpile Kelly went ahead of Ferril. Arriving at the woodpile, they walked around it, and the conversation relating to Mrs. Kelly was renewed. Ferril went in one direction and Kelly in the other. Finally Ferril was at a point west of the woodpile, and was stooping over or squatted down. Kelly was nearly south of Ferril. Ferril sort of raised up, said, "I believe the damn bitch has told you," and had a mean look on his face. Ferril had his hand in his right-hand pocket and pulled his hand out of his pocket. Kelly could not say whether Ferril got his hand clear out of his pocket, but believed he did. Kelly did not see anything in Ferril's hand. While Kelly knew Ferril could not kill him with a nasty look, Kelly could not tell what he had, and was afraid of him. The gun was a pump gun, and with Ferril fifteen feet, or more than fifteen feet, from Kelly, the fatal shot was fired. Kelly testified, however, he did not expect to stop at Ferril's house when he left home. He was going north to his farm, and then on to Corwin to see about a note. He was in the habit of carrying the gun in the truck. The gun was in the truck when he was ready to start to Corwin, and he

took it along to shoot hawks, or possibly prairie dogs. He stopped at Ferril's because Ferril signaled for him to come in. When he got out of the truck to go to the woodpile he did not have it in mind to kill Ferril. He did not intend to kill Ferril at any time before Ferril's death. The idea of shooting Ferril never entered Kelly's mind. Kelly not only had no intention to shoot Ferril, but Kelly did not know he did shoot Ferril.

The result of the foregoing was that, while Kelly denied intention to shoot and knowledge of the shooting, self-defense was woven into his story, he asked for instructions relating to self-defense, and the court was obliged to instruct the jury on that subject.

Kelly complains of a portion of the instruction concerning self-defense which related to the apparent situation as engendering reasonable belief in Kelly's mind of design on Ferril's part to take Kelly's life, or do Kelly great bodily harm. While one may act on circumstances as they appear to him, and not as they actually are, he may not kill unless the apprehension of immediate danger, arising from the situation as it appears to him, be reasonable, and of this reasonableness the jury are to judge. This has been the law in this state since the decision in the case of *State v. Howard*, 14 Kan. 173 (1875). The instruction given was correct, and the jury properly found the killing was done maliciously, and not in self-defense.

Ferril was alone when he was killed, and under our antiquated criminal procedure, Kelly was free to frame a chameleon defense. So he said that just as Ferril arose from his squatting posture, with the hard look on his face, Kelly got an awful headache; it just seemed something snapped; he guessed everything went black; and he remembered nothing until he found himself standing there with the gun pointed, and Ferril lying on the ground. He did not remember hearing any explosion of the gun.

A specialist in mental and nervous disorders testified for Kelly that it is not unusual for things to turn black, and things to happen, to persons under stress of extreme emotion, which they have no recollection of, judgment and reason having departed for the time being. One remarkable thing about Kelly's snapping in the head was that apparently he did not become conscious of the phenomenon until after he consulted the specialist, some seventeen days after he was arrested. At least, Kelly said nothing about it to McClaflin, or to his father, or at home, or to the sheriff who took him to jail, and who was his friend.

The court gave defendant the full benefit of his claimed mental quirk in the instructions to the jury. In that connection the court instructed the jury that debauchery of a man's wife does not justify or excuse the killing of the paramour, and said the doctrine of the "unwritten law" does not obtain in this state. Kelly objects to the court's mention of the unwritten law, on the ground there was nothing in the case to justify reference to it. Kelly put his wife on the witness stand and had her exploit her degradation in disgusting detail, presumably for the purpose of accounting for the fact that his reason was dethroned at Ferril's woodpile just long enough for him to shoot Ferril with deadly accuracy. Conceding that was the sole purpose, one effect of the testimony would be to arouse in the minds of the jury the savage notion, persistence of which is evidence of the brute derivation of the human mind—that a man is justified in killing his wife's seducer. Therefore the instruction was wisely given.

Kelly complains that the court erred in instructing the jury that malice was inferred from the killing. The court gave no such instruction. The instruction relating to inference of malice from killing with a deadly weapon was based on the decision in the case of *State v. Earnest*, 56 Kan. 31, 42 Pac. 359. The instruction was open to the verbal criticism that the court used the word "may" in place of the word "should," in advising the jury with respect to the scope of inquiry in determining the question of malice, but it is clear the effect of the instruction was that malice should be determined from all the evidence in the case pertaining to that subject.

The court instructed the jury as follows:

"If you believe that any witnesses have willfully or knowingly sworn falsely concerning any material matter involved in the trial, you are at liberty to reject all or any portion of such testimony except in so far as it is corroborated by other credible evidence in the case."

Kelly contends the effect of this instruction was that if any of the testimony of a false witness was corroborated by credible evidence, the jury were bound to accept and act upon the corroborated portion of the testimony. The contention is supported by the decision in the case of *Rogers v. State*, 8 Okla. Cr. Rep. 226. If a false witness testifies to a material fact, and there is credible corroborative evidence, the jury may still reject the testimony of the false witness and consider only the credible evidence relating to the fact. Therefore, the exception should not have been tacked to the instruction.

(See *Burgess v. Alcorn,* 75 Kan. 735, 90 Pac. 239.) The instruction was not open, however, to the objection urged against it. It meant no more than it said, and it did not tell the jury they were obliged to believe and act on the corroborated testimony of the false witness. It was still for the jury to determine the force and effect to be given to the testimony of each witness, and the jury were so advised in connection with the quoted instruction.

The court instructed the jury with reference to offenses inferior in degree to murder in the second degree, and Kelly contends some of the instructions were incorrect.

The instruction relating to manslaughter in the first degree was incorrect. In this instance, manslaughter in the first degree would be the killing of Ferril by act, procurement, or culpable negligence of Kelly, while Kelly was engaged in perpetrating or attempting to perpetrate a crime not amounting to felony, when the killing would be murder at common law. The court made Ferril the actor in the perpetration or attempted perpetration of crime not amounting to felony.

The court instructed the jury with reference to manslaughter in the second degree—killing in heat of passion, without design to effect death, but in a cruel and unusual manner, and killing Ferril unnecessarily after an attempt by Ferril to commit felony or do an unlawful act had failed. These instructions were not open to the objections urged against them. Besides this, there was no evidence making it necessary for the court to instruct on manslaughter in either first or second degree. While it is the duty of the court to give all instructions which may be necessary for information of the jury in arriving at a verdict, instructions must be based on evidence, and in this instance manslaughter in the first and second degrees could be derived only by imagining facts which would be incongruous with any rational interpretation of the evidence. The same is true with respect to involuntary manslaughter, third degree, which would be manslaughter committed by Kelly while he was engaged in trespass.

The instructions relating to manslaughter in the third degree, consisting of killing not justifiable or excusable, with a dangerous weapon, in heat of passion, without design to effect death, and the instruction relating to manslaughter in the fourth degree, were correct and adequate.

Whether the instructions concerning the various degrees of man-

slaughter were correct or not, is not now material. It is true the court has held in a number of cases that if there be evidence warranting instructions relating to inferior degrees, such instructions should be given. But, beginning with the case of *State v. Dickson*, 6 Kan. 209 (1870), and extending to the case of *State v. Hardisty*, 121 Kan. 576, 249 Pac. 617 (1926), there are fifteen decisions of ·this court applying the rule that when instructions complained of relate to a degree of crime inferior to the principal offense charged in the information, and inferior to that of which defendant was convicted, the instructions will be deemed not to have prejudiced the jury, whether correct or not. The following from the opinion in the case of *State v. McCarty*, 54 Kan. 52, 36 Pac. 338, has special application to this case:

"We agree with counsel that the court should correctly charge the jury as to all the law applicable to every state of facts fairly supported by evidence, and that the rule declared in *State v. Dickson*, supra, ought not be extended to unreasonable limits. But where the jury under proper instructions have found a defendant guilty of every element of the superior offense, erroneous instructions or a total failure to instruct with reference to an offense inferior in degree and including less criminality cannot, logically, be said to have influenced the jury. The failure of the court can only be said to be prejudicial to the defendant on the theory that the jury failed·to fully comprehend the definition of the superior degree, or misconstrued and misapplied the law to the facts. To indulge in such presumptions, even though we know that mistakes are made by juries and courts alike, is to overturn the whole theory of the administration of justice." (p. 58.)

Kelly does not complain of the instructions relating to murder in the first degree and murder in the second degree. After instructing the jury with regard to murder in the first degree, the court said:

"If the jury finds and believes from the evidence that the state of Kansas has proven each and all of said above and foregoing material allegations in the manner and form as herein instructed, then it will be the duty of the jury to find the defendant guilty of murder in the first degree; but if the state of Kansas has failed to prove any one or more of the above and foregoing material allegations in the manner and form as herein instructed, then it will be the duty of the jury to proceed to inquire whether the state of Kansas has proved the defendant guilty of the lesser offense of murder in the second degree."

After instructing the jury with respect to murder in the second degree, the court said:

"If you find that the state of Kansas has proved each and all of the above and foregoing material allegations in the manner and form as herein in-

structed, to the satisfaction of the jury beyond a reasonable doubt, then it will be the duty of the jury to find, and the jury should find the defendant guilty of murder in the second degree; but if the state of Kansas has failed to prove any one or more of the above and foregoing material allegations in the manner and form as herein instructed, then you cannot find the defendant guilty of murder in the second degree, and it will be your duty to proceed to inquire whether the state of Kansas has proved the defendant guilty of the still lesser offense of manslaughter in the first degree."

The jury found Kelly guilty of murder in the second degree, and stated the elements of the offense in their verdict. The verdict was sustained by abundant evidence. Kelly produced no witness from Corwin with whom Kelly had business about a note, or any other kind of business, and it is manifest Kelly went to Ferril's house that Saturday morning with malice in his heart. The defenses of self-defense and snapping in the head were farcical. Doubtless he found Ferril alone out at the woodpile, and shot him, as Kelly told the sheriff, without Ferril knowing Kelly intended to shoot. The jury, however, made the concession that the shooting was done on sudden impulse on seeing Ferril rise up—purposely and maliciously, but without deliberation and premeditation. Therefore, in view of the court's instructions relating to method of considering the case, there is no basis for an assumption that the jury were misled by any instruction relating to manslaughter.

In view of the defense made, a bit of admitted evidence was merely prematurely admitted. Some excluded evidence was properly excluded. The cross-examination of a witness to impeach his credibility was properly permitted. Remarks of the county attorney in arguing the case were improper, because based on a fact not proved, but merely assumed in cross-examining Kelly. It is plain Kelly went to Ferril's house because he expected to find Ferril there, and the argument was so far-fetched, in view of the known facts relating to the killing, it cannot be said the argument had a prejudicial effect on the jury. The sentence imposed on Kelly conformed to the law.

The judgment of the district court is affirmed.