No. 29,248.

THE STATE OF KANSAS, *Appellee,* v. EDWARD A. TOWLE, *Appellant.*

(295 Pac. 645.)

Opinion filed February 7, 1931.

*Benjamin F. Endres* and *Keefe O'Keefe,* both of Leavenworth, for the appellant.

*Roland Boynton,* attorney-general, *R. O. Mason,* assistant attorney-general, *Jesse A. Hall,* county attorney, and *James B. Kelsey,* assistant county attorney, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: Edward A. Towle was found guilty of robbery in the first degree. He has appealed and contends, (1) that the evidence was insufficient to sustain the verdict; (2) that the court erred in refusing to give instructions requested; and (3) that the court erred in giving instructions 6 and 21; also that the court erred in overruling a motion for a new trial and in pronouncing judgment.

The first of these questions was presented to the court by motion for a directed verdict at the close of the state's evidence, and at the close of all the evidence. The specific contention is that the evidence does not connect appellant with the crime. The evidence may be stated briefly as follows: Samuel L. Scott, a veteran of the civil war, about 86 years of age, a member of the National Military Home at Leavenworth, was robbed of a sum of money sometime

during the night of October 5, 1928. The amount was charged in the information as $750. At the preliminary examination Scott testified that the amount was $662. At the trial in the district court he testified that at the preliminary he was laboring under some excitement, that since then he had computed the amount, and that it was $442. The night of the robbery he was sleeping on the cot or bunk 15, in ward 7, which is the basement of barracks 12, which is a brick building about 180 feet long and 40 feet wide. The ward has 18 cots or bunks placed side by side, 9 in a row, about 4 feet apart, with an aisle in the center about 6 feet wide. The electric lights in the ward were turned off at nine o'clock at night and turned on about six o'clock in the morning. Scott slept with his vest on and had the money pinned with safety pins in the pocket of his vest. At sometime in the night—he did not know what time —some one came and shook his bed. He spoke up and said: "What is the matter with you?" He was grabbed by the neck and pressed back. His vest was pulled off of him, some of the buttons coming off and dropping on the floor. His vest and money were taken. It was so dark Scott did not see the man who robbed him. He appears to have reported this to the night sergeant, who reported to the captain in charge, between two and three o'clock in the morning. There is a little discrepancy about this time, as to whether it was 2:20 or 2:55. The captain notified the guard at the gate, the sheriff's office, and gave other information.

About two o'clock in the morning the night of October 5 two deputy sheriffs, investigating other matters, drove by the gate of the Soldiers Home and talked for a few minutes with the guard there. They then drove south and east on the Muncie road. This road runs along the south side of the Soldiers Home grounds. South of those grounds, to the side of the road, they saw a Chevrolet coupé parked. They stopped and investigated, found there was no one in the coupé, but in it were two hats and two coats. In the pocket of one coat was a red card issued by the authorities of the Soldiers Home to inmates to permit them to pass out of or into the grounds. This card bore the name of Edward A. Towle, it having been issued to him. The officers also took the license number on the car. Finding no one in or about the coupé, they drove back by the gate of the Soldiers Home and talked with the guard there, and then learned of the robbery of Scott. This was about three o'clock in the morn-

ing. They drove back to where the Chevrolet coupé had been parked and found that it was gone. They made further investigation, but could not locate the coupé or its occupants that night. The next day there was found, a short distance south and east on the Muncie road, under a culvert, two caps, a pair of overalls and a torn vest. This vest was of the make and kind issued to members of the Home by the officials and was identified by Scott as the vest he wore at the time he was robbed. The Chevrolet coupé proved to belong to Steve Holmes, a member of the Soldiers Home, who occupied the same quarters with Towle. He had loaned the car to Towle shortly before ten o'clock the night of October 5. Edward A. Towle was a member of the Soldiers Home. He was out of his quarters there the night of October 5 until about six o'clock in the morning. The information obtained by the deputy sheriff was communicated to the officers of the Soldiers Home. Towle was awakened that morning by one of the officers of the Home, about 6:30 o'clock, and was told that he was under arrest. He said he wanted to wash, and took a towel and went to the bathroom, came back, and put the towel in his locker. Later inspections disclosed that $385 in currency was wrapped up in the towel in his locker. Towle was taken to the sheriff's office and questioned, and was wearing the hat and coat with the red pass card in it which the deputy sheriff had seen in the Chevrolet coupé. He admitted having used Holmes' car; said that he had driven to Kansas City with it and had gambled there and won money, the amount of which he did not know. It was the theory of the prosecution that Towle borrowed the Chevrolet coupé, and that he and some confederate parked it near the road south of the Soldiers Home, left their hats and coats in the car, and perhaps wore the caps, and one of them the overalls found the next day with the vest, and after committing the robbery they went back to the coupé and drove south, where the caps and overalls and vest were discarded, and possibly drove on to Kansas City; but that, at any rate, Towle returned to the Home so as to leave the Chevrolet coupé parked near his barracks and be in his bed before the lights were turned on in the morning.

Scott did not know the defendant, and at the trial did not recall having met him at any other place than in court. Towle, as a witness in his own behalf, told a story with respect to his movements on the night of October 5, and who accompanied him, which differed

materially from the story he told the officers when they examined him the morning after the robbery. In both stories, however, he said he had been to Kansas City and won money by gambling. On the witness stand he stated the amount was $50 or $60. He claimed all the money found in his locker. No effort was made to identify the bills found in defendant's locker with those that were taken from Scott. Scott's evidence was that a part of his money was in silver, a part of it in gold, and a part of it in currency. All of the money found in defendant's locker was currency. We have no hesitancy in holding the evidence sufficient to sustain the verdict, from which it follows the court did not err in refusing defendant's requested instructions that he be discharged.

Complaint is made of instruction No. 6 given by the court on the credibility of witnesses, and No. 21 on alibi. These instructions are substantially in the form heretofore approved by this court (see *Burgess v. Alcorn,* 75 Kan. 735, 90 Pac. 239; *State v. Kelly,* 131 Kan. 357, 363, 291 Pac. 945; *State v. Price,* 55 Kan. 610, 40 Pac. 1001; *State v. Smith,* 114 Kan. 186, 217 Pac. 307) and form no basis for prejudicial error, and especially when considered with other instructions given by the court which the jury was told to do, and was bound to do. (*State v. Snyder,* 127 Kan. 7, 272 Pac. 169.)

Finding no prejudicial error in the record, the judgment of the court below is affirmed.