No. 62,061

STATE OF KANSAS, *Appellee*, v. MITCHELL HARTFIELD, *Appellant*.

(781 P.2d 1050)

432

Opinion filed October 27, 1989.

*Thomas H. Johnson*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, and *Martha J. Coffman*, special appellate defender, were with him on the briefs for appellant.

*Mona Furst*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Robert T. Stephan*, attorney general, were with her on the briefs for appellee.

The opinion of the court was delivered by

MILLER, C.J.: Mitchell Hartfield brings this direct appeal from his jury convictions in Sedgwick District Court of first-degree murder, K.S.A. 21-3401; aggravated battery, K.S.A. 21-3414; and aggravated burglary, K.S.A. 21-3716. He raises numerous issues, which we will discuss later. We turn first to the evidence.

Hartfield was convicted of stabbing to death Danny O'Day, the companion of his former girlfriend, Leslie Amar; of aggravated battery committed on Amar; and of the aggravated burglary of

her home. Amar moved out of Hartfield's home, after several incidents where he used violence against her, and into the home of her girlfriend, Tishon Lane. Hartfield pursued Amar and tried to get her to move back with him. His face-to-face confrontations usually ended in his threatening or physically harming her. She called the police for protection several times and filed a complaint against him. Hartfield also subjected Amar's parents to numerous entreaties for help in getting back with their daughter and threats to harm her.

Early in July, Amar and Lane discovered Hartfield had broken into their home while they were gone. The situation had become so threatening that they borrowed a handgun and some mace for protection. Amar's mother testified that on July 18 Hartfield came to her hair salon and "kept talking about doing something to [Amar], worse than beating her up."

The next night, July 19, Amar and Lane invited Danny O'Day, Amar's new companion, and Terrence Shine, Lane's boyfriend, to dinner. Hartfield kept calling during dinner, threatening that he was coming over; that they wouldn't know when he was "going to strike," but "a lot of innocent people [were] going to get hurt." All four of the people at the dinner party were frightened, and Amar called the police. The police responded and found that someone had put sugar in the gas tank of O'Day's car. The four stayed up into the early morning hours, finding the mace and checking the door and window locks.

Hartfield never came to the apartment, and the four finally fell asleep. Shine left at about 9 a.m. Sometime after that, Lane woke up to the sound of the front door being kicked in. Amar woke up to find Hartfield on top of O'Day in the bed. The evidence shows O'Day was stabbed with a hunting knife. Amar reached for the gun she had hidden under the bed and shot Hartfield three times with her eyes closed. Hartfield was hit in the left shoulder at his clavicle, the inside surface of his left arm, and the outside surface of his right knee.

Lane ran into the room and saw a bloody knife on the floor. Amar was holding a gun on Hartfield and screaming for Lane to call the police. Lane ran out of the house to call from her family's liquor store next door.

While Amar was waiting for Lane to call the police, she noticed her hand was bleeding. She picked up the knife on the

floor and threw it out the front door so Hartfield could not reach it. This action enabled Hartfield to grapple the gun from Amar and shoot her in the chest, "since [she had] shot him." He shot her twice in the back as she attempted to hide in a closet, and tried several times to shoot her again, but the gun was empty.

When Lane completed her call to the police she ran back to find Hartfield chasing Amar all over the yard, slashing her with the bloody knife. He followed her as she ran toward the liquor store, but left in his car when he saw the police coming. He was captured after a chase.

Amar suffered a gunshot wound through her chest, two gunshot wounds in her back, and numerous knife wounds over her body. The big hunting knife Hartfield had used on her was found on the ground by the police.

O'Day was found inside the house bleeding to death. It appeared that he had slipped from the bed and crawled to the bathroom. He had a nonfatal stab wound in his back. The cause of death was a four-inch wound through the ribs which almost cut the heart in two.

Hartfield's version of events, to which he testified at trial, was that he received a call at work from O'Day on the morning of the 20th. O'Day told him he and Amar wanted to talk about the problems they had been having with him and wanted to try and resolve them. Hartfield said he needed to go to the Health Department anyway and asked his supervisor if he could leave to go there that morning. After receiving permission, he decided to telephone the Department instead, and used his time to make the visit to Amar's house. He said O'Day met him at the front door with profane language and slammed his finger in the door. When the door came back open, O'Day "was coming at me with a knife." He said he caught O'Day from behind, twisted the knife towards O'Day, fell on him, and the knife went in his chest. He then pulled the knife out of O'Day and stabbed him in the back. At this point, he said, Amar shot him.

The coroner who did the autopsy on O'Day testified that Hartfield's claim that the wound was caused by O'Day falling on the knife was not a realistic medical possibility. Amar, Lane, and Shine testified the knife was not theirs or O'Day's.

The first issue is whether the trial court erred in denying, after a full hearing, a defense motion to suppress statements Hartfield

made to his parole officer, Bridgette Clark, when she visited him in jail four days after the killing to serve him with notice of his parole violations. Hartfield claims error on three theories. The first is that Clark visited him after he had requested, and been appointed, counsel, but before he had the opportunity to visit with counsel. He claims admission of the statements made to the officer were thus in violation of his Sixth Amendment right to counsel.

Clark testified that, after she and Hartfield had exchanged greetings, Hartfield said, "Miss Clark, I want to tell you what happened." Clark said she told him that because of the severity of the case she felt she needed to give him his *Miranda* rights first so "he could be protected." She reported Hartfield said, "You don't really need to," but she insisted. She read Hartfield his rights. She gave the *Miranda* rights form to Hartfield to look at and sign if he agreed that he understood what his rights were. Hartfield signed and also told her orally that he understood his rights because Clark emphasized their importance to him. She said she asked him, "[D]o you want an attorney, if you want to wait for your attorney you can," but he told her he "wanted to let [her] know what was going on." She said he "was really eager to let me know what was going on, because he knew his parole was in jeopardy." He told her, "the news media has heard [Amar's] side of it but they haven't heard [mine]."

Clark notified Hartfield of three parole violations; (1) failure to notify her of his arrest on the 20th of July; (2) using a knife to stab Amar and O'Day; and (3) engaging in threatening behavior against Amar and O'Day. She testified Hartfield said, "Miss Clark, I did what's on this form, but it was self-defense." Hartfield's explanation to Clark was similar to his story at trial. He told her he left work the morning of the 20th because Amar and O'Day "lured him to the house" on some pretext. He said when he knocked on the door, O'Day opened it but, seeing it was Hartfield, tried to shut it again. He said he had to push the door open again to get his hand out and then saw O'Day had a knife. He said they struggled, and O'Day fell on top of the knife, and he fell on top of O'Day. When O'Day moved towards the bathroom, Hartfield stabbed him in the back. He shot and stabbed Amar after she shot him, because "I had to protect myself."

A criminal suspect has the right to counsel during custodial

interrogations under the Sixth Amendment right to counsel and the right not to incriminate oneself under the Fifth and Fourteenth Amendments. *Edwards v. Arizona*, 451 U.S. 477, 484-85, 68 L. Ed. 2d 378, 101 S. Ct. 1880, *reh. denied* 452 U.S. 973 (1981); *State v. Norris*, 244 Kan. 326, 332-33, 768 P.2d 296 (1989). Law enforcement officers are required to inform the suspect of his right to have counsel present during questioning under the warnings set forth in *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). Parole officers in Kansas are law enforcement agents required to read a parolee his *Miranda* rights before investigating a new felony. *State v. Lekas*, 201 Kan. 579, 442 P.2d 11 (1968).

The State bears the burden of showing by a preponderance of the evidence that a statement was made voluntarily, without police coercion. The court must consider, in making its decision, the totality of the circumstances, including the duration and fairness of the questioning and the defendant's age, intellect, and background. *Edwards v. Arizona*, 451 U.S. at 482; *State v. Waugh*, 238 Kan. 537, 712 P.2d 1243 (1986). Evidence presented at the hearing showed that Hartfield was an adult of apparently normal intelligence who had obtained the equivalent of a high school degree and graduated from technical school. He volunteered at trial that he had taken at least one college course. He had extensive background in the criminal justice system; Clark was aware of seven separate prior felony convictions on his record. The "interrogation" was quite fair; Hartfield initiated the communication and Clark was careful to inform him of his rights. He understood that anything he said could be used against him, but he was not specifically told that his parole officer could testify against him.

Hartfield argues the trial court erred in refusing to suppress Clark's testimony under *Michigan v. Jackson*, 475 U.S. 625, 89 L. Ed. 2d 631, 106 S. Ct. 1404 (1986). In *Jackson*, the defendants, like Hartfield, had requested that counsel be appointed them because of indigency. The Court therefore held that confessions gained from later police interrogation were inadmissible even though *Miranda* warnings were first given. Hartfield argues his case is identical, but forgets the large caveat of the Court's rule: An accused in custody who has at any point requested counsel is not subject to further questioning until the accused has had the

opportunity to consult with counsel *unless the accused himself has initiated further communication with the law enforcement officers.* See *Jackson,* 475 U.S. 625, and *Edwards,* 451 U.S. at 484-85. In this case, Hartfield clearly initiated the communications.

We now move to Hartfield's next theory concerning this issue: that the parole officer's testimony should have been suppressed because defendant was not capable of knowingly, voluntarily, and intelligently relinquishing his rights because he was on pain medication for his gunshot wounds during her visit. Once it has been determined that a defendant has requested counsel, a subsequent statement may be admitted only if the defendant initiated the conversation *and* knowingly and intelligently waived the right to counsel. *Smith v. Illinois,* 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490 (1984). Hartfield said he was on pain medication during Clark's visit, but there was no evidence as to what type or quantity. Clark knew Hartfield had been in the hospital for two days after he was shot, and had been told that they initially "didn't know [if] he was going to make it." She knew when she talked to him on the 24th that he had only been out of the hospital a few days. Hartfield told her he had been on pain medication in the hospital, but she did not attempt to ascertain if he was still on medication. She said he did not appear to be under the influence of drugs and his demeanor was no different from that on her previous encounters with him.

Hartfield testified he was "probably" in a lot of pain when Clark visited him and said he could only remember vague bits and pieces of the interview. When asked why he did not tell Clark he was in pain or on medication and therefore did not wish to talk to her, he said, "I wanted her to know. For one I want[ed] to try to get out on bond. . . . . I wanted her to know . . . what all had took place . . . . I wanted the situation to be resolved so I could get out of jail." The trial court ruled Hartfield's rationale for talking to Clark indicated a rational, well thought out plan, and that the evidence showed his statements were intelligently and voluntarily given.

Where a trial court conducts a full pretrial hearing and finds a statement was freely, voluntarily, and knowingly given, and admits it into evidence, the decision to admit the statement will be undisturbed on appeal if supported by substantial competent

evidence. *State v. Norris*, 244 Kan. at 333. Hartfield claims the State failed to meet its burden because it failed to present evidence at the hearing that the medication prescribed for Hartfield had no effect on his cognitive ability. We find no case where the State's burden is extended so far. The trial court's decision was amply supported by competent substantial evidence.

We next reach Hartfield's third theory on this issue: that Clark's statement should have been suppressed because he invoked his right to counsel during the interview itself. A criminal suspect may declare his desire for an attorney at any point in a custodial interrogation; that declaration voids any previous waiver of his right not to speak without consulting an attorney. See *Miranda*, 384 U.S. at 474.

At trial, Clark explained that she read Hartfield his *Miranda* rights after he said he wanted to talk to her about the crimes. Directly after ascertaining that he understood his rights, she began to do what she had come to do—read him the parole violations for which he had been charged. When she read him the first violation, failure to notify her of his arrest, he gave his explanations for that. She then continued to the second violation, using the knife—and that is when he gave his story of self-defense which he later attempted to have suppressed. According to her testimony at the suppression hearing, it was only later, after she had finished reading all the charges, that Hartfield mentioned a lawyer. At the end of the parole violations charges form there was a statement which said the parolee could have a preliminary hearing, or could waive it, and Hartfield told Clark he wanted to discuss that option with his attorney before he signed the form. That was, Clark testified, the first and only time he mentioned an attorney.

The issue arises because Clark was confusing in her testimony on this point at the hearing. At one point, she contradicted her testimony by saying Hartfield told her his story *after* having mentioned a lawyer concerning the preliminary hearing. The conflict was finally resolved when she explained that Hartfield told her his story of self-defense *before* mentioning an attorney, but also "briefly overviewed what he had already told me" afterwards. We find no merit in this issue.

The next issue, closely related, is whether the trial court, in

admitting the statement Hartfield made to Clark, erred in allowing evidence that she was his parole officer and that he was on parole at the time of the crimes. The State argued this evidence was relevant to the credibility of Hartfield's story of self-defense—he justified his actions because of his fear that his parole would be revoked. Hartfield also objects to the admission of testimony that Amar's father talked to a patrolman about getting Hartfield's parole revoked because he had been threatening Amar. The State argued that this evidence was relevant to counter a theory that Amar and her friends had lured him to the house and attacked him because they no longer had any confidence that legal methods would work to keep him away.

The court decided to allow the information with a limiting instruction to the jury that it could consider the evidence that Hartfield was on parole only as it related to show "the background, relationship, and circumstances existing" during the occurrences to which the witnesses testified. The court instructed the jury not to consider the evidence for any other purpose.

Amar's stepfather's contact with the police officer regarding possible parole revocation tends to support the State's evidence of defendant's threats. The fact that Clark was a parole officer tends to explain why she went to see Hartfield, why he apparently knew her, and why he wanted to explain his version of the facts to her. None of these reasons, however, justify the admission of evidence that defendant was on parole and, thus, had committed a prior crime.

Evidence of other crimes is inadmissible to prove a defendant's disposition to commit other crimes. It is inadmissible unless the evidence is relevant to prove some other material fact *including* motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, K.S.A. 60-455, or unless it is relevant as a part of the res gestae of the crime charged. *State v. Redford*, 242 Kan. 658, 666, 750 P.2d 1013 (1988); *State v. Peck*, 237 Kan. 756, Syl. ¶ 1, 703 P.2d 781 (1985).

Assuming that the evidence showing that Hartfield had committed a previous crime should not have been admitted, it was not reversible error. The evidence against Hartfield was overwhelming. The court gave an instruction limiting the use to which the jury was to consider the evidence. Hartfield himself,

in his testimony, referred three different times to his being on parole, saying he never carried a knife or drank too much because of it. Under K.S.A. 60-261, we must disregard any error in the admission of evidence which does not amount to a denial of substantial justice. Upon the record before us, it is clear that the admission of evidence that defendant was on parole could not have affected the result of the trial. The admission was harmless error. See *State v. Bly*, 215 Kan. 168, 178-79, 523 P.2d 397 (1974).

The next issue is whether the trial court erred in allowing the endorsement of George Parker, a witness for the State, after the trial began. Parker testified he saw Hartfield with a large hunting knife on July 18, 1987, two days before the killing.

The State is required to endorse its witnesses on the face of the complaint or information. K.S.A. 22-3201(6). However, under that statute, late endorsements are allowed at the discretion of the trial court. The defense should be given a reasonable time to interview and investigate the new witness. *State v. Hunter*, 241 Kan. 629, 638, 740 P.2d 559 (1987). The decision of the trial court on this matter will not be overturned on appeal absent the showing of actual prejudice by the defendant in his ability to defend his case. *Hunter*, 241 Kan. at 638.

Amar's stepfather had informed the prosecutor during the investigation of this case that Parker had seen Hartfield with a knife a few days before the killing. Amar's stepfather attempted to contact Parker from the prosecutor's office, but was not able to do so. He said he would contact him later and arrange for the prosecutor to interview him. It was not until the Sunday evening of October 25, 1987, that Amar's stepfather told the prosecutor his friend's full name, address, phone number, and story. Early on October 27, the State moved to endorse Parker as a witness.

The court withheld its ruling until the defense had an opportunity to interview the witness. Later in the day, defense counsel reported that his investigator had interviewed Parker fully, but counsel asked for a continuance so he could investigate Parker. The court was agreeable, asking counsel, "Why don't you go find out how much time it will take? I'm not adverse to recessing the case until next week, if you need that much time." Counsel returned and told the court how much time his investigator would need, and noted he was still objecting to the late endorsement. Before finally allowing the testimony, the judge

made a full record showing that he had given the defense plenty of time to overcome its surprise. The State did not call Parker as a witness for over 48 hours after it moved to endorse him.

Hartfield claims he was prejudiced because his sole defense was self-defense, built on the theory espoused by his counsel in his opening statement that he had not possessed a knife. However, he can hardly claim to be surprised by the State's theory that he did indeed have the knife. He was aware that Amar and her friends were going to testify that the knife was not theirs or O'Day's. In addition, he knew in advance that several other people were to give testimony indicating that the knife was his. A neighbor of Amar's testified she saw a man with something in his hand kick in the front door just before the shooting began. She then saw the man outside the house again, stabbing Amar with a large knife. An officer testified two neighborhood children told him they had seen a man park in the alley near Amar's house, get out carrying a large knife, and kick in the *back* door. The older child repeated this story at trial, but testified she did not see the man actually enter the house; she believed that to have happened because her younger brother told her he saw this. Hartfield would have us believe that this inconsistency, and the fact that the adult witness could not identify what he had in his hand, left him so easy in his mind that he devised a completely different trial strategy than he would have used had he known of Parker's cumulative testimony.

Hartfield also urges prejudice because the prosecutor was aware that such testimony could be forthcoming a month before trial and did not inform him. Intentional withholding of the name of a witness as part of trial strategy by the prosecution will not be tolerated. See *State v. Stafford,* 213 Kan. 152, 164, 515 P.2d 769 (1973), *modified* 213 Kan. 585, 518 P.2d 136 (1974). There is, however, no evidence that the prosecutor's oversight was intentional. The trial court specifically gave the defense the opportunity to present any such evidence, and correctly noted that, were this found to be the case, it would declare a mistrial and begin proceedings to have the prosecutor investigated for violation of the Canons of Ethics. Certainly it would have been better had the prosecutor notified the defense of the possibility of the testimony, and more vigorously pursued the interview with Parker. But neither prosecutors nor defense attorneys have the

benefit of limitless time and perfect hindsight to do all that would be done in a perfect case. We find no abuse of discretion and no error in allowing the late endorsement.

The next issue is whether the trial court erred in admitting into evidence certain photographs of O'Day's body and the crime scene. True reproduction photographs of relevant conditions material to the case are admissible, even if gruesome, at the discretion of the trial court. *State v. Hill*, 242 Kan. 68, 79, 744 P.2d 1228 (1987); *State v. Ruebke*, 240 Kan. 493, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987).

Hartfield first objects to seven color photographs of the crime scene, claiming they are repetitive and unduly gruesome. The first four pictures, Exhibits 49, 51, 52, and 53, show the bathroom where O'Day died. Each shot is from a different angle and supports, from the blood markings, the State's theory that O'Day crawled to the bathroom while bleeding. They are not repetitive nor unduly gruesome. The next three pictures, Exhibits 60, 62, and 63, show blood on a closet door. These pictures support Amar's testimony that, when Hartfield began shooting her, she first ran and tried to hide in a nearby closet. The first picture, from a distance, shows the big box inside the closet that she testified was in the way. The second photograph, at a closer angle, shows more clearly the blood on the wall, box, and door, which supports her story. The final picture, a close-up, shows the blood on the doorknob, showing she was already injured when trying to enter the closet. These pictures serve a reasonable purpose and are not unduly gruesome.

The final nine photographs show O'Day's injuries. The first five photographs show O'Day's external injuries. The next shows the blood splashed on O'Day's face, and supports the State's theory that the violence of the injuries is contrary to Hartfield's testimony that O'Day fell on the knife. Another photograph is of O'Day's torso, and shows his chest wound in comparison to the size of his body. Without this photograph, it might not be evident how large and savage the wound is. The next is a close-up of the wound with a ruler showing it to measure four inches. This helps to explain the pathologist's testimony that a sawing motion was implemented, again casting doubt on Hartfield's story. Hartfield complains these last two photographs are misleading as they show alterations to the body made when physicians attempted to

save O'Day's life by opening the chest to try and suture the heart. However, this further opening was cleanly sewn shut before the photographs were taken, and is barely noticeable. The surgical procedure and the stitches were explained to the jury. This is not a case where the victim's wounds look worse than they were because of medical intervention. Two photographs show O'Day's back wound in comparison to his body, and the size of that wound. These are relevant to counter Hartfield's self-defense claim. None of these photographs are repetitious, without relevant purpose, or unduly gruesome.

The final three pictures deal with O'Day's internal injuries. These wounds were impossible to document until the autopsy. When dealing with pictures of an autopsy, great care must be taken so that the pictures do not simply shock and revolt, but rather help the jury understand the medical testimony. See *State v. Prouse*, 244 Kan. 292, 767 P.2d 1308 (1989). The first is a close-up of the internal chest showing how the knife penetrated the rib cage and showing the great force and sawing motion applied. It is relevant to show lack of accident, force, cause of death, and premeditation. The second is a close-up photograph of the heart, demonstrating that it has been jaggedly sawed and almost severed. This goes to prove intent, lack of accident, and cause of death. The final photograph, showing stab wounds to the kidney, also shows lack of accident and casts doubt on the self-defense claim.

The coroner testified these pictures were helpful in aiding his explanation to the jury of the nature and the extent of the wounds, and he used them during his testimony. The trial court specially instructed the jury concerning the last three pictures. We find no error in the admission of these photographic exhibits.

The final issues concern whether the trial court erred in its instructions to the jury. The trial court has the duty to instruct the jury upon the law which applies to the theories of both the defendant and the State for which supporting evidence exists. *State v. Hunter*, 241 Kan. 629, Syl. ¶ 8.

The first error claimed is Instruction No. 12, which reads as follows:

"The intent with which an act is committed, being but the mental state of the person committing it, direct proof of such intent is not required, but it may be proved by any competent evidence, direct or circumstantial. Such intent, how-

ever, must be established by the weight of evidence required by these instructions."

Defense counsel objected to this instruction as drawing too much attention to the element of intent. Hartfield notes on appeal that Instruction No. 11 defines "intentionally," and contends that should have been sufficient. The trial court added Instruction No. 12 of its own wording in preference to PIK Crim. 2d 54.01, requested by the State, which reads as follows:

"Ordinarily a person intends all of the usual consequences of his voluntary acts. This inference may be considered by you along with all the other evidence in the case. You may accept or reject it in determining whether the State has met its burden to prove the required criminal intent of the defendant. This burden never shifts to the defendant."

The trial court preferred its instruction because it believed the first line of the PIK instruction put too great a burden on the defendant. The court told defense counsel it would give the PIK instruction rather than the other if counsel preferred. Defense counsel did not prefer the PIK instruction but retained his objection to the court's instruction.

Intent was a crucial element in the case. We have upheld PIK Crim. 2d 54.01 in many cases. See *State v. Norris*, 244 Kan. 326, 338, 768 P.2d 296 (1989); *State v. Bird*, 240 Kan. 288, 300-01, 729 P.2d 1136 (1986); *State v. Ransom*, 239 Kan. 594, 605-06, 722 P.2d 540 (1986). Even though the court did not use the preferred PIK instruction, its instruction on this element was not erroneous.

The next error claimed is the cumulative effect of the trial court's instructions concerning provocation. Jury instructions are to be considered together and read as a whole. *State v. Morris*, 244 Kan. 22, 23, 765 P.2d 1120 (1988). The trial court gave five instructions concerning self-defense. The first two, of which Hartfield does not complain, read as follows:

## INSTRUCTION NO. 14 (PIK Crim. 2d 54.17):

"The defendant has claimed his conduct was justified as self defense.

"A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself against such aggressor's imminent use of unlawful force. Such justification requires both a belief on the part of the defendant and the existence of facts that would persuade a reasonable person to that belief."

## INSTRUCTION NO. 15:

"The defendant claims as a defense that he acted in self defense. Evidence in

support of this claim should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant.

"If the defense asserted causes you to have a reasonable doubt as to the defendant's guilt, you should find the defendant not guilty."

Hartfield objects to the following three instructions:

### INSTRUCTION NO. 13 (PIK Crim. 2d 54.20):

"A person is not justified in using force in defense of himself if he is attempting to commit, committing or escaping after the commission of Aggravated Burglary or Attempted Aggravated Burglary, forcible felonies."

### INSTRUCTION NO. 16 (PIK Crim. 2d 54.21):

"A person is not permitted to provoke an attack on himself with the specific intention to use such attack as a justification for inflicting bodily harm upon the person he provoked and then claim self defense as a justification for inflicting bodily harm upon the person he provoked."

### INSTRUCTION NO. 17 (PIK Crim. 2d 54.22):

"A person who initially provokes the use of force against himself is not justified in the use of force to defend himself unless:

"1. He has reasonable ground to believe that he is in present danger of death or great bodily harm, and he has used every reasonable means to escape such danger other than the use of force which is likely to cause death or great bodily harm to the other person; or,

"2. He has in good faith withdrawn and indicates clearly to the other person that he desires to withdraw and stop the use of force, but the other person continues or resumes the use of force."

Instructions Nos. 13, 16, and 17 are merely rewordings of K.S.A. 21-3214(1), (2), and (3). They clearly state the law as it applied to the evidence in this case and do not provide grounds for reversal. See *State v. Beard*, 220 Kan. 580, 581-82, 552 P.2d 900 (1976).

The next claim of error is that the trial court erred in giving the jury an instruction and a verdict form which allowed the jury to return a less than unanimous verdict on Count II, charging premeditated murder, and on Count III, charging felony murder. Hartfield contends this violated his right to a unanimous verdict by a jury of twelve, of which each member is convinced beyond a reasonable doubt of his guilt. See Sections 5 and 10 of the Bill of Rights of the Kansas Constitution; K.S.A. 22-3403; K.S.A. 22-3421; K.S.A. 22-3423(1)(d); *State v. McKay*, 217 Kan. 11, 12, 535 P.2d 945 (1975); *State v. Scott*, 156 Kan. 11, 14, 131 P.2d 664 (1942).

The trial court instructed on both counts together in Instruction No. 4 as follows:

"The defendant is charged with the crime of murder in the first degree. The defendant pleads not guilty.

"To establish this charge, (premeditated and deliberate), each of the following claims must be proved: [elements are given].

"Or, to establish this charge (felony murder) each of the following claims must be proved: [elements are given]."

Defense counsel did not object at trial and in fact approved the instruction. The standard of review, when an instruction was not challenged at trial but is challenged on appeal, is whether the instruction was clearly erroneous, and that, but for the error, there was a real possibility the jury would have returned a different verdict. K.S.A. 22-3414(3); *State v. DeMoss*, 244 Kan. 387, 391-92, 770 P.2d 441 (1989).

The verdict form did not require the jury to reach a unanimous decision about the theory used to prove first-degree murder, providing:

"We, the Jury impaneled and sworn in the above entitled case, do upon our oath, as to the charge of 1st degree murder, find the defendant, Mitchell Hartfield:

_____ Not guilty
_____ Guilty of first degree murder
_____ Guilty of the lesser included
           *offense of second degree murder*
_____ Guilty of the lesser included
           offense of voluntary manslaughter
_____ Guilty of the lesser included
           offense of involuntary manslaughter."

Hartfield complains the form gives no indication how many jurors believed the State proved felony murder and how many believed the State proved premeditated murder. Under the instructions, the jury could have returned a verdict of first-degree murder without agreeing on the theory used to prove it.

Several months after the trial, the trial court on its own motion ordered a hearing, calling as a witness the presiding juror in the instant case. The juror testified that the jury had unanimously agreed that Hartfield was guilty of premeditated first-degree murder. Defense counsel contended that the entire jury should be questioned in the matter, but he was overruled. Defense counsel stated at the hearing that he himself submitted the verdict form. He had raised no objections to the form at trial, nor had he raised the issue in his motion for a new trial.

Hartfield nevertheless contends we should overrule our decision in *State v. Wilson*, 220 Kan. 341, 345, 552 P.2d 931 (1976), in which we held: "When an accused is charged in one count of an information with both premeditated murder and felony murder it matters not whether some members of the jury arrive at a verdict of guilt based on proof of premeditation while others arrive at a verdict of guilt by reason of the killer's malignant purpose." We have held that the State is not required to elect between premeditated and felony murder, as K.S.A. 21-3401 establishes the single offense of murder in the first degree, and only provides alternative methods of proving the crime. *State v. Chism*, 243 Kan. 484, 491, 759 P.2d 105 (1988). We noted that PIK Crim. 2d 56.02-A informs the jury that the State may prove first-degree murder either by premeditation or felony. While the elements of each alternative are recommended to be in separate instructions, the instruction concludes: "If you do not have a reasonable doubt from all the evidence that the state has proven murder in the first degree on *either or both theories*, then you will enter a verdict of guilty." (Emphasis supplied.) We find no reason to overturn the cited cases. This issue is without merit.

The final error claimed is that the trial court improperly emphasized the possibility of false testimony by giving Instructions No. 23 and No. 24. The instructions read as follows:

### INSTRUCTION NO. 23 (PIK Crim. 2d 52.09):

"It is for you to determine the weight and credit to be given the testimony of each witness. You have a right to use that knowledge and experience which you possess in common with men in general, in regards to the matter about which a witness has testified."

### INSTRUCTION NO. 24:

"If you find that any witness has willfully testified falsely concerning any material matter, you have a right to distrust the testimony of that witness in other matters, and you may reject all or part of the testimony of that witness, or you may give it such weight as you think it deserves. You should not reject any testimony without cause."

When the defense objected to Instruction No. 24, the trial judge first believed the instruction to be contained in PIK. When he found it was not, and the State objected to its removal, he decided, "We might as well test it," and left it in. The State claims the defense did not specifically state in its objection that

the instruction unduly emphasizes false testimony. The record, however, shows the defense objection was directed at the emphasis on false testimony, and that both the court and the State understood this.

An instruction identical to Instruction No. 24 was before this court in *State v. Willis*, 240 Kan. 580, 586, 731 P.2d 287 (1987). No objection had been made to the instruction in *Willis* at the trial level, and we held that the instruction was not clearly erroneous. The instruction is derived from the ancient maxim *falsus in uno, falsus in omnibus* (false or untruthful as to one thing, false or untruthful as to all things). Reliance by a court upon the maxim was approved in *The Santissima Trinidad*, 20 U.S., (7 Wheat.) 283, 339, 5 L. Ed. 454 (1822). We cited that case and relied upon it in *Campbell v. State*, 3 Kan. 488, 498 (1866), where we said:

"Upon the whole we are inclined to agree with Hon. Justice Story in his opinion in the case of The Santissima Trinidad, (7 Wheat., 283,) that where a party speaks to a fact, in respect to which he cannot be presumed liable to a mistake, courts are bound upon principles of law, morality and justice, to apply *'falsus in uno falsus in omnibus,'* and, too, as with him, 'what ground of judicial belief can there be left where the party has shown such gross insensibility to the difference between right and wrong, between truth and falsehood?' "

The harshness of the maxim was recognized in *Shellabarger v. Nafus*, 15 Kan. 547, 554-55 (1875), where the court overruled *Campbell* stating:

"The jury ought to be allowed to weigh every portion of the testimony of every witness, and to give to each portion of the testimony just such consideration as it is entitled to, considering all the facts and circumstances of the case. It is within the common experience of all men, that the different portions of the testimony of the same witness may differ vastly in value. A witness may, under great temptations, and in some isolated case, swear falsely, and yet where the temptation is removed, where there is nothing to operate on his hopes and fears, his passions and prejudices, where he has no interest in the matter except to tell the truth, his testimony may be of great value. And this being so, no inflexible rule of law should be interposed between the witness and the jury, commanding the jury to take all, or to exclude all, of his testiomony. So far as the decision made by this court in case of *Campbell v. The State*, 3 Kas. 488, and the decisions in such other cases as follow that case, are in conflict with the foregoing views, said cases are overruled."

We approved jury instructions following the *Shellabarger* rule in *State v. Towle*, 132 Kan. 296, 295 Pac. 645 (1931); *State v. Kelly*, 131 Kan. 357, 291 Pac. 945 (1930); and *Burgess v. Alcorn*, 75 Kan. 735, 90 Pac. 239 (1907). In *Kelly*, the jury had been instructed:

"If you believe that any witnesses have willfully or knowingly sworn falsely concerning any material matter involved in the trial, you are at liberty to reject all or any portion of such testimony *except in so far as it is corroborated by other credible evidence in the case.*" (Emphasis supplied.) 131 Kan. at 362.

We held that the emphasized portion should not have been given, but approved the remainder of the instruction. It is usually held that the instruction should only be given where it is warranted by the evidence, and the giving of the instruction is discretionary with the trial court. See 88 C.J.S., Trial §§ 315c, 364, and 75 Am. Jur. 2d Trial §§ 864, 865.

In the case at hand, there was a sufficient basis in the evidence for the giving of the instruction. However, such an instruction is criticized as emphasizing portions of the evidence, contrary to good practice, and has not been included in the proposed instructions in PIK Crim. 2d. We find it preferable for a trial court to give the jury PIK Crim. 2d 52.09, set forth above and given in this case as Instruction No. 23, and not to give the *falsus in uno, falsus in omnibus* instruction. The instruction as here given is not a misstatement of the law, follows the *Shellabarger* rule, and, in light of the overwhelming evidence against the defendant, did not constitute prejudicial or reversible error.

The judgment is affirmed.

SIX, J., not participating.