No. 80,320

STATE OF KANSAS, *Appellee,* v. JASON M. WAKEFIELD, *Appellant.*

(977 P.2d 941)

Opinion filed April 16, 1999.

*Richard Ney*, of Law Offices of Richard Ney, of Wichita, argued the cause and was on the briefs for appellant.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant appeals his convictions of premeditated murder, felony murder, aggravated burglary, and felony theft and the trial court's imposition of the hard 40 sentence. Defendant claims the evidence was insufficient to convict for first-degree premeditated murder, his statements to the police should have been suppressed, failure to suppress evidence seized from his residence was error, his warrantless arrest was improper, the court's failure to admit polygraph evidence was error, his sentence for premeditated murder was illegal, and the trial court erred in imposing the hard 40 sentence.

On September 13, 1996, at approximately 7 a.m., Sedgwick County deputy sheriff officers Phillip Gleason and Gary Henderson, were dispatched to a residence in a rural area of Wichita. The dispatcher advised that a 911 caller had reported two dead bodies at the residence.

As officers approached the house, they noted that the back door was open, the kitchen had been ransacked, and the lights did not work. When Officer Gleason called out to identify himself as a police officer, there was no response. The officers walked through the first floor of the residence noting the disarray and other evidence of a burglary. When Officer Gleason reached the stairway to the second floor, he again called out to identify himself. A small child answered from upstairs.

Two children came down the stairs, a boy and a girl, around 4 and 6 years of age. When Officer Gleason asked the boy where his parents were, the child responded, "They're upstairs in the bedroom. They're dead." Their 9-year-old sister had gone to a neighbor's house to call 911. An officer took the children outside the residence to a place of safety.

Officers Gleason and Henderson went up the stairs to the second floor. The officers entered the master bedroom and found the bodies of a man and a woman lying under the covers in the bed. The victims, later identified as Doug and Beth Brittain, had each been shot in the face.

The officers secured the crime scene. In the kitchen, Officer Gleason found a .22 caliber sawed-off rifle on the kitchen counter

which contained one live round in the chamber, but the gun was not operational. In the backyard of the residence, the officers found a purse containing a driver's license issued to Beth Brittain. Subsequent investigation revealed that some of the electric breaker switches had been pulled shutting off electricity to parts of the house. Numerous items taken from the Brittain home included televisions, a suitcase, stereo boom box, carrying case, VCR, vacuum sweeper, stereo, and several guns.

The day after the murders, police officers made a routine traffic stop of a car in which Gavin Scott was a passenger. Noting the suspicious behavior of the occupants in the car, the officers obtained the driver's consent to search the car.

In the search of the car, the officers found a magazine clip and a Raven .25 semiautomatic pistol near where Scott had been sitting. The officers arrested Scott for possession of a firearm after a felony conviction. Further investigation revealed that the Raven was one of several guns stolen in the burglary of the Brittain residence. When questioned by officers, Scott confessed to being a participant in the burglary. Scott was later charged with aggravated burglary and felony theft, two counts of premeditated first-degree murder, and possession of a firearm after a felony conviction.

Based on information known to the officers, a search warrant was obtained for 1638 N. Woodlawn, Wichita, Kansas, the property where Scott and several others lived. The property included a primary residence, 1638 N. Woodlawn, and a smaller secondary residence, 1636 N. Woodlawn, which was attached to the primary residence at the roof line. The defendant, Jason Wakefield, lived in the secondary residence.

When the officers executed the search warrant at 7 a.m. on September 17, 1996, Wakefield was found hiding in the attic of the secondary residence. Wakefield was arrested and taken to jail. Items seized in executing the search included: ammunition, a 9mm Beretta handgun, television, VCR, video camera, vacuum sweeper, wallet, and stereo.

After Wakefield's arrest in the early morning hours of September 17, 1996, and before his first appearance on the afternoon of September 19, 1996, he gave three videotaped statements to law en-

forcement officers. On September 19, 1996, Wakefield was charged with aggravated burglary, two counts of premeditated first-degree murder, and one count of felony theft.

Upon motion of the State, Wakefield's and Scott's trials were severed. Prior to trial, Wakefield filed a motion to suppress the evidence seized during the execution of the search warrant at his residence, a motion to suppress statements elicited from him following his arrest, a motion to quash his arrest and suppress evidence obtained as a result of the arrest, and a motion to admit the results of polygraph tests which the sheriff's officers administered to him during their investigation of the crimes. Hearings were held on Wakefield's motions on April 23 and 25, 1997. The trial court denied each motion.

The jury trial commenced on April 28, 1997. The jury convicted Wakefield of one count of felony theft, two counts of premeditated murder, two counts of felony murder, two counts of first-degree murder on the combined theories of premeditated murder and felony murder, and one count of aggravated burglary. Wakefield was sentenced to two consecutive terms of hard 40 life imprisonment for the two counts of premeditated murder, one concurrent term of 34 months for the aggravated burglary conviction, and a concurrent term of 7 months for the felony theft conviction. Wakefield appeals his convictions and sentence. The appeal is before this court pursuant to K.S.A. 21-4627.

## SUFFICIENCY OF THE EVIDENCE

Wakefield concedes that he willingly participated in the aggravated burglary of the Brittain home and that the Brittains died during the course of that burglary. He asserts, however, that the evidence was not sufficient to establish that he participated in the homicide of the Brittains.

When the sufficiency of the evidence is challenged, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Claiborne*, 262 Kan. 416, 425, 940 P.2d 27 (1997).

Wakefield did not testify at trial. His theory of defense was that although he participated in the burglary, Gavin Scott was solely responsible for killing the Brittains. Wakefield claims that after Scott killed the Brittains, it was Scott's threats with a gun that forced him to take the Brittains' belongings. In fact, argues Wakefield, the evidence at trial shows that when Scott expressed an intention to kill the Brittain children, Wakefield talked Scott out of it.

The State points out that it prosecuted Wakefield on the theory he aided and abetted Scott in the premeditated murders. The State contends that from the evidence presented at trial, a rational factfinder could have found Wakefield aided and abetted in the crimes of premeditated murder.

It is well established in Kansas law that the mere presence of an accused at the time and place of the crime alleged is not sufficient to make the accused guilty of the crime, but if from the facts and circumstances surrounding the defendant's presence at the time and from the defendant's conduct it appears that the defendant's presence did in fact encourage someone else to commit the criminal act, guilt may be inferred. *State v. Smolin*, 221 Kan. 149, 153, 557 P.2d 1241 (1976). In the absence of anything in a person's conduct showing a design to encourage, incite, aid, abet, or assist in the crime, the trier of the facts may consider failure of such person to oppose the commission of the crime in connection with other circumstances and conclude therefrom that the person assented to the commission of the crime, lent his or her countenance and approval thereto, and thereby aided and abetted the commission of the crime. 221 Kan. at 153.

Wakefield's videotaped statements to the sheriff's officers were played for the jury. Regarding Wakefield's participation in the killings, the following exchange occurred during Wakefield's third interview:

"[OFFICER]: . . . Okay, at any time that you were in the house, did [Scott] encourage you or try to get you to shoot those people?

. . . .

"WAKEFIELD: He sa, he said, do you want to take care of them? I said, I ain't doing that shit.

"[OFFICER]: Okay, was this when you were downstairs?

"WAKEFIELD:    Uh-huh

"[OFFICER]:    Okay, so there was some talk downstairs about, about doing them before you went upstairs.

"WAKEFIELD:    Uh-huh. I said, man, I said, we don't even need to do that. I said, they all asleep.

"[OFFICER]:    Okay, why, why was he wanting to shoot them?

"WAKEFIELD:    I don't know, he didn't tell me.

"[OFFICER]:    Okay.

"WAKEFIELD:    Didn't tell me nothing about them, I didn't, he didn't tell me nothing about knowing them, he didn't tell me shit about nothing like that.

"[OFFICER]:    Okay, but you guys are downstairs and he says, do you want to do them or do you want me to.

"WAKEFIELD:    Hm, and I said man, we don't even need to do it, cause they asleep (inaudible).

"[OFFICER]:    So you weren't surprised when you walked upstairs and he's got the rifle.

"WAKEFIELD:    I'm surprised, cause like I said, man, they was asleep. I told him we didn't need to do no shit like that.

"[OFFICER]:    But he talked about it before when you were downstairs.

"WAKEFIELD:    He just asked me if I wanted to do it.

"[OFFICER]:    Okay, did he, did he get upset with you? Uh, okay, reason I'm asking is there's been some comments made by some people that he called you a pussy cause you wouldn't do it and,

"WAKEFIELD:    No, no,

"[OFFICER]:    just kinda ragging on you.

"WAKEFIELD:    he was just like, fine, whatever and everything like that, and I was like, I said, man, I said man, shit you don't even gotta do that. I said, they all asleep. I said, anything that you want that we need is right here. I said, man, there's a TV, you know, VCR, stereo, you know, shit, (inaudible) happy with that shit.

"[OFFICER]:    But he says to you, so you want to do, did he say, do you want to do them or do you want me to or did he just say, do you want to.

"WAKEFIELD:    He said, he said, you want to do them? I said, man, we don't need to.

"[OFFICER]:    But you knew what he meant.

"WAKEFIELD:    Yeah. Do them is (inaudible)."

Wakefield then said that Scott went up the stairs and shot the Brittains in their bed. According to Wakefield, he did not wish to kill the Brittains because he did not think that their deaths were necessary to the commission of the burglary.

When Scott went up the stairs with the stated purpose of killing the Brittains, Wakefield acquiesced in that decision and continued to load the Brittains' belongings into the truck. Wakefield's willing and intentional participation in the aggravated burglary, his failure to oppose Scott's premeditated killing, and his own criminal activity in the burglary after the killing of the Brittains were sufficient evidence from which the jury could conclude that Wakefield aided and abetted the premeditated killing of Doug and Beth Brittain.

## FAILURE TO SUPPRESS STATEMENTS

Wakefield was arrested at 7:30 a.m. on September 17, 1996. He was brought before the magistrate for his first appearance the afternoon of September 19, 1996. During the period between his arrest and his first appearance, Wakefield gave three statements where he progressively admitted participation in the crimes. During the interviews, the officers repeatedly told Wakefield they were attempting to help him and encouraged Wakefield to cooperate in the investigation. They falsely represented to Wakefield that they had information and evidence implicating Wakefield in the murder.

Wakefield contends that the trial court erred in refusing to suppress the statements in the interviews conducted during a period of unnecessary and intentional delay in bringing him before the court for first appearance. Wakefield asserts that if he had been brought before the court for first appearance without delay, he would have been appointed an attorney to protect his interests and would not have made the admissions which resulted in his conviction.

### Unnecessary Delay

K.S.A. 1998 Supp. 22-2901(1) provides, in part, that when an arrest is made in the county where the crime charged is alleged to have been committed, the person arrested shall be taken without unnecessary delay before the nearest magistrate and a complaint shall be filed forthwith. The statute provides no sanctions in the event there is unnecessary delay in taking a person under arrest before the nearest available magistrate. Therefore, the first consid-

eration in determining the effect of a delay in bringing an accused before the court for first appearance is whether the delay was unnecessary.

The purpose of the first appearance is to safeguard individual rights. K.S.A. 1998 Supp. 22-2901(1) was enacted to abolish unlawful detention that provides an opportunity for improper pressure by the police before the arrestee has been informed of his or her rights. It is designed to reduce the opportunity for third-degree practices by the police and to protect the rights of the accused by making certain that he or she is advised of constitutional rights by a judicial officer without hampering effective and intelligent law enforcement. *State v. Crouch & Reeder*, 230 Kan. 783, 785-86, 641 P.2d 394 (1982).

Wakefield urges this court to adopt the federal *McNabb-Mallory* rule which provides that in federal cases, incriminating statements are not admissible in evidence where they have been elicited from an accused during a period of illegal detention, in violation of Rule 5(a) of the Federal Rules of Criminal Procedure. See *Mallory v. United States*, 354 U.S. 449, 1 L. Ed. 2d 1479, 77 S. Ct. 1356 (1957); *McNabb v. United States*, 318 U.S. 332, 87 L. Ed. 819, 63 S. Ct. 608 (1943). This court has previously held that the *McNabb-Mallory* rule is not applicable to Kansas cases. *State v. Stubbs*, 195 Kan. 396, 407 P.2d 215 (1965).

On September 18, 1996, the day after Wakefield was arrested, an assistant district attorney requested the judge to find that postponing Wakefield's first appearance an additional day was a delay necessary to the investigation. The assistant district attorney had not at that time decided whether to file death penalty charges against Wakefield. The assistant district attorney explained that before making that determination there were multiple crime scenes to process, witnesses to interview, and evidence to inventory. The assistant district attorney informed the judge that because there was a potential for charging capital murder, it was important to fully investigate the crimes before filing charges. The assistant district attorney explained:

"Your Honor, in fact, for your information, we talked with [the capital defender] this morning; and he . . . indicated the desire to represent the one who was

more culpable, I guess more likely to go to trial or whatever. And in further talking with [the capitol defender] we got the impression . . . that if we can determine who the alleged shooter is, if there is in fact only one, it is likely they would prefer to have that person. This is one of the issues we still are examining, which—if not both—which one would, if we can determine that.

"Then the other thing is he notified us there were two other people—they offered names—who they would prefer to have represent the other person—I believe that's Mr. Ney and Mr. Rathbun—and we told them we would get back with them. But, at this point, there's no way we can answer the questions they were asking."

The judge agreed that, in the interest of avoiding attorney conflicts, it was important for the prosecutor to ascertain whether to charge Scott or Wakefield as the more culpable actor in the crime.

Clearly, Wakefield was not taken for first appearance without delay. However, when considering the circumstances of this case, and the potential conflicts in appointing the capital defender, that delay was necessary. The next question is whether, during the period of necessary delay, Wakefield was subjected to coercive law enforcement questioning.

## Wakefield's Statements

Even an unwarranted delay in taking the accused before a magistrate after he or she has been arrested is not in itself a denial of due process unless that delay has in some way prejudiced the right of the accused to a fair trial. Whether a delay is prejudicial depends on the facts and circumstances of the case. See *State v. Goodseal*, 220 Kan. 487, 500, 553 P.2d 279 (1976).

The relevant question is, during the delay in the first appearance and appointing counsel, were the statements of the accused compelled by pressure or threats? At the conclusion of the hearing, the district judge stated:

"It's clear that to me that [Wakefield] was afforded many opportunities for breaks, refreshments, opportunities to use the restroom, things like that; so there is nothing overt about the length of time that he was held or the length of time of the questioning process that would lead me to believe that wore down Mr. Wakefield to the degree that his statement or his waiver and his statements were not knowing and voluntarily—knowingly, voluntarily, and intelligently made.

"Furthermore, the only—and I'll just cut to the chase. The only circumstances that could give rise to the proposition that it was not a knowing, voluntary, and

intelligent waiver are just those that Mr. Ney has addressed: the statements made by the police officers, sheriff's officers. For example, Detective Lathrop's saying they're trying to help you. The lies that were told by Detective Oliver and Detective Lathrop, do these amount to a level—a sufficient level that makes an otherwise valid confession inadmissible in that it is likely to produce a false or untrustworthy confession? The bottom line here is that trickery, deceit, manipulation, et cetera, can all be effective tools of law enforcement so then—so long as these statements and tools do not cross the law. I don't see any false promises that were made; and, in fact, I would have to say that perhaps Mr. Wakefield has benefitted at least in the charges that have been brought against him by his cooperation and talking with the police or with the sheriff's office.

"And regarding comments or statements or lies made, for example, by Detective Oliver that there were fingerprints upstairs that weren't there or there were people who would testify, while they are not true—which makes them, of course, lies— I see them more as bluffs that were effectively used to convince Mr. Wakefield to make certain statements to them in response, and they worked. I mean, police officers lie every day. Narcotics officers, their physical appearance is in and of itself a lie. It's something that is a necessary tool, and so long as the officers don't cross the line, it is effective and legal; and I am finding that there is nothing insofar as those methods that were used that makes these statements involuntary."

When a trial court conducts a full hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely and voluntarily given, and admits the statement into evidence at the trial, an appellate court accepts that determination if it is supported by substantial competent evidence. *State v. Lewis*, 258 Kan. 24, 36, 899 P.2d 1027 (1995).

When determining the voluntariness of a confession, one views the totality of the circumstances, including: (1) the duration and manner of interrogation; (2) the accused's ability upon request to communicate with the outside world; (3) the accused's age, intellect, and background; and (4) the fairness of the officers in conducting the interrogation. *State v. Alexander*, 240 Kan. 273, 282, 729 P.2d 1126 (1986).

First, Wakefield asserts that his confession was involuntary because he was isolated from outside help during this period. Wakefield's assertion is not born out in the record, as the following excerpt from the second interview reveals:

"WAKEFIELD:   Um, I was wondering um, I'm uh, I was wanting to know if I was able to try to get a hold of someone so they could go and get all my property from the house, my clothes and shit.

"[OFFICER]:   Don't they, don't you have phone privileges over there?

"WAKEFIELD:     Yeah, I do, but, what I'm saying, am, am I able to have some-
                one go over there and get that.
"[OFFICER]:      Who, who, who can we get hold of?
"WAKEFIELD:     Well, I was gonna try, well, I was gonna try to get a hold of
                my girlfriend's mom. I've got my uh, sister, uh, my sister's
                coming over tomorrow for a visit and then I'm having, I'm
                gonna have either, either have her go and get it or have her
                go to my girlfriend's mom's house and ask her to go get it.
"[OFFICER]:      Okay.
. . . .
"WAKEFIELD:     Just like my clothes and my change and shit, that way I can
                have some.
"[OFFICER]:      Let us take a break here, we'll talk about, uh, I'm sure that
                we can help you do something as far as getting a hold of
                somebody.
"WAKEFIELD:     Can I go to the bathroom?
"[OFFICER]:      Yeah, if you need to go right now? I'll go with you . . . ."

The videotaped interview shows that Wakefield had telephone privileges and visiting hours. He was not isolated from the outside world.

Regarding the officers' fairness in misrepresenting their motivations and the evidence against Wakefield, the officers' conduct was clearly in the interest of the State in conducting a thorough and accurate investigation in the homicides and burglary. Such tactics by the officers do not make a confession involuntary so long as the defendant's statements were the product of his or her free and independent will. *State v. Graham*, 244 Kan. 194, 203, 768 P.2d 259 (1989).

In *State v. Kornstett*, 62 Kan. 221, 61 Pac. 805 (1900), a sheriff told the suspect he believed the suspect knew who had committed the murder and would feel better if he told the truth. The *Kornstett* court stated mere advice or an admonition to the defendant to tell the truth, which is neither a threat nor a promise of a benefit, does not render a confession inadmissible. 62 Kan. at 227.

In *State v. Ninci*, 262 Kan. 21, 39, 936 P.2d 1364 (1997), interrogating officers told Ninci " 'now is the time to come clean' " and " 'you can do some things to help yourself now.' " When Ninci indicated he was very scared of the codefendant and feared for his life, the officers told Ninci that the codefendant " 'knows you know

too much, we can help you on that, but it has to be a two way street. We are willing to do what we can to keep you safe, but we can't do it unless we know exactly what is going on.'" 262 Kan. at 39. Ninci was told that if he did not cooperate, then the officers really did not care what happened to him. According to Ninci, the officers indicated that it would help him if he confessed. This court upheld the trial court's denial of Ninci's motion to suppress, stating:

"'"It is well settled that an extrajudicial confession will not be received in evidence unless it has been freely and voluntarily made. If it has been extorted by fear or induced by hope of profit, benefit, or amelioration, it will be excluded as involuntary. However, the advice or admonition to the defendent to speak the truth, which does not import either a threat or benefit, will not make a following confession incompetent."' [Citation omitted.]" 262 Kan. at 39.

In *Frazier v. Cupp*, 394 U.S. 731, 22 L. Ed. 2d 684, 89 S. Ct. 1420 (1969), the questioning officer falsely told the defendant that the defendant's cousin had been brought in and confessed. The Court stated that while the misrepresentation made by the police was relevant, after viewing the totality of the circumstances, it was insufficient to make the otherwise voluntary confession inadmissible. 394 U.S. at 739.

Was Wakefield's will overborne at the time he confessed? Wakefield does not allege that the sheriff's officers threatened him or that the officers made him any unfulfilled promises. Therefore, after reviewing the totality of the circumstances, the district court correctly determined that the misrepresentations made to Wakefield by the officers during the interviews did not cause Wakefield's confession to be involuntary. See *Lynumn v. Illinois*, 372 U.S. 528, 534, 9 L. Ed. 2d 922, 83 S. Ct. 917 (1963).

## SEARCH WARRANT

During the relevant time period, Wakefield lived in a small residence attached to a larger residence on N. Woodland. The house number of the larger residence was 1638. Although the post office recognized the 1636 residence as a separate address, there was no number on 1636. The mailbox for 1636 was attached to 1638, next to 1638's mailbox. The 1636 residence was a converted garage and was located toward the rear of the 1638 residence. Each unit in

the complex had its own kitchen and bathroom facilities. Scott and several of Wakefield's friends lived in the 1638 residence. Wakefield lived in the 1636 structure. The 1636/1638 complex was owned by one landlord and rented in one contract.

The search warrant issued for the search of the complex contained the following:

"When Scott was arrested, he was a passenger in a vehicle driven by Robert C. Wilson. In the interview, Wilson stated that Scott told him about the burglary of the Brittain residence. Scott told Wilson that the guns from the burglary were hidden in the rear structure at 1638 N. Woodland. Wilson described the rear structure as 'the building way in the back.'

"The premises of 1638 N. Woodland, Wichita, Sedgwick County, Kansas, described as a two story single family dwelling yellow in color with brown trim. A second single story residence is detached from the primary residence and is located at the end of the driveway. 1638 is the fifth residence south of 16th on the east side of Woodland. A chainlink fence surrounds the back yard."

Wakefield contends that the trial court should have suppressed the physical evidence seized during the search of his property because the search warrant failed to state the address of his residence and the sheriff's officers entered his residence without knocking.

### Sufficiency of Search Warrant

It is constitutionally required that a search warrant shall particularly describe the place to be searched. *State v. Gordon*, 221 Kan. 253, Syl. ¶ 4, 559 P.2d 312 (1977). A search warrant directed against a multiple occupancy structure generally will be held invalid if it fails to describe the particular room or subunit to be searched with sufficient definiteness to preclude a search of other units. 221 Kan. 253, Syl. ¶ 7.

Wakefield argues that a fair reading of the search warrant would exclude, rather than include, authorization for the search of 1636. The contrary is true. The warrant clearly stated that Scott had told Wilson "that the guns from the burglary were hidden in the rear structure at 1638 N. Woodland." The search warrant particularly authorized the search of the 1636 complex even though it did not state the smaller residence number. Even if the warrant had included both house numbers, the number of the smaller residence would have been of no use to the officers because no house number

was affixed to the smaller residence. The search warrant particularly described the area to be searched and authorized the search of the rear structure. The judge did not err in failing to suppress the evidence seized in 1636 pursuant to the search warrant.

## No-Knock Entry

Wakefield argues that the officers' entry into his home was unreasonable because there was insufficient evidence of exigent circumstances to justify the officers' noncompliance with the 10-second knock and announce rule. At trial, Wakefield objected to the admission of evidence obtained as a result of the search of the secondary residence, based on the officers' failure to wait 10 seconds before kicking the door in after they announced their presence.

When executing the search warrant at the primary residence, the sheriff's officers knocked, announced their presence, and waited 10 seconds before forcing the door open. After securing the primary residence, the officers approached the secondary residence where, from outside the door, they perceived movement within the residence. The officers knocked on the door of the secondary residence and immediately kicked the door open.

In 1995, the United States Supreme Court held that when executing a search warrant, the common-law principle of announcement is always an element of the reasonableness inquiry under the Fourth Amendment. *Wilson v. Arkansas*, 514 U.S. 927, 934, 131 L. Ed. 2d 976, 115 S. Ct. 1914 (1995). In *Wilson*, the Supreme Court held that the Fourth Amendment incorporates the common-law requirement that, absent reasonable countervailing law enforcement interests, police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry. 514 U.S. at 934.

A subsequent United States Supreme Court case, *Richards v. Wisconsin*, 520 U.S. 385, 137 L. Ed. 2d 615, 117 S. Ct. 1416 (1997), struck down a Wisconsin per se rule that officers are never required to knock and announce when executing a search warrant in a felony drug investigation because of the special circumstances inherent in drug investigations. The *Richards* Court held that in order to

justify a no-knock entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence. 520 U.S. at 386.

Based on the *Wilson* and *Richards* restrictions, it is necessary to evaluate the police officers' actions in light of perceived exigent circumstances existing at the time of the execution of the warrant to determine if sufficient cause existed to justify the officers' failure to give Wakefield notice of their intent to execute the search warrant.

To determine if exigent circumstances existed, the judge considered the testimony of the officers who executed the search warrant:

"[T]he officers did have information that Jason Wakefield was certainly involved in the burglary that led to the shooting.

"There was also information that there were weapons in that building. I find that the circumstances, given the proximity of the buildings, the nature of the items to be sought—and that would be weapons and ammunition—and the information that the law enforcement officers had regarding Jason Wakefield, that it was reasonable under all of the totality of the circumstances to enter without waiting the sufficient ten seconds or however many seconds between knocking and entering the building."

The judge found that exigent circumstances existed which justified the immediate kicking in of the door of the secondary residence.

A trial court's denial of a motion to suppress evidence will be upheld on review if supported by substantial competent evidence. *State v. Crowder*, 20 Kan. App. 2d 117, 119, 887 P.2d 698 (1994). When reviewing a decision on a motion to suppress, the appellate court gives great deference to the trial court's factual findings, though the ultimate determination of the suppression of the evidence is a legal question requiring independent appellate determination. *State v. Vandiver*, 257 Kan. 53, 58, 891 P.2d 350 (1995).

We note that the officers were investigating a burglary and a double homicide, and they had reason to believe that Wakefield, a suspected participant in the crimes, was inside the residence. The officers knew that multiple firearms had been taken in the burglary of the Brittain home, and, according to the search warrant, they

believed that the stolen firearms were to be found in the secondary residence. Under the totality of these circumstances, the trial judge did not err in denying Wakefield's motion to suppress the evidence obtained in the search of his residence.

## WARRANTLESS ARREST

Wakefield asserts, absent "hot pursuit" or exigent circumstances, an accused may be arrested at his home only upon police securing a properly issued arrest warrant. Wakefield relies on *Payton v. New York*, 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980), and *State v. Johnson*, 253 Kan. 356, 856 P.2d 134 (1993).

K.S.A. 1998 Supp. 22-2401(c)(1) provides that a law enforcement officer may arrest a person if the officer has probable cause to believe that the person is committing or has committed a felony. The term "probable cause" in the statute is defined as that quantum of evidence which would lead a prudent person to believe that an offense has been committed. *State v. Peterson*, 236 Kan. 821, 826, 696 P.2d 387 (1985). The correct test is whether a warrant if sought could have been obtained by the arresting officer. 236 Kan. at 827. In determining whether probable cause to arrest exists, all information in the officer's possession, fair inferences therefrom, and facts may be taken into consideration. *City of Dodge City v. Hadley*, 262 Kan. 234, 246, 936 P.2d 1347 (1997).

K.S.A. 22-2509 provides that in the execution of a search warrant, the person executing the warrant may reasonably detain and search any person in the place at the time. Wakefield concedes that if this court finds that the officers were present in his home pursuant to a lawful search warrant, no arrest warrant was required and his arrest was lawful. When the officers executed the search warrant, they knew that Scott had implicated Wakefield in the crime. Fingerprints from the sawed-off rifle had been processed and one of the fingerprints matched Wakefield's fingerprints. When the officers entered Wakefield's residence, they saw property that fit the description of property taken in the burglary of the Brittains' residence, and they found Wakefield hiding in the attic.

Because we have concluded that the search was valid and the execution of the search warrant under the circumstances was law-

ful, the evidence found at Wakefield's residence gave the arresting officers probable cause to detain and then arrest Wakefield during the execution of the search warrant. Therefore, the trial court did not err in denying Wakefield's motion to quash the warrantless arrest.

## POLYGRAPH EVIDENCE

During the murder investigation, Wakefield made three statements to the sheriff's officers. While making the statements, Wakefield submitted to five polygraph tests. The results of the tests indicated that Wakefield was deceptive when stating that he had not been present when the Brittains were shot, and he was truthful when stating that he had not shot the Brittains.

Prior to trial, Wakefield moved to admit the results of these polygraph tests. Wakefield argued to the judge it would be unfair to not allow the test results into evidence because the testing was an integral part of the police questioning process. The trial judge overruled the motion, stating that a scientific basis for the polygraph evidence had not been shown, such evidence would invade the province of the jury, and the polygraph would improperly corroborate Wakefield's statements. The judge concluded by stating that, if the occasion arose, the evidence could be admitted to rebut an attempt by the State to prove that Wakefield, not Scott, was the shooter.

The rule in Kansas is that absent a stipulation of the parties, the results of a polygraph examination are too unreliable to be admissible at trial. *State v. Ulland*, 24 Kan. App. 2d 249, 258-59, 943 P.2d 947 (1997). The prohibition is based on the reliability of the results to accurately measure truthfulness or deceptiveness and the unique role of the jury as truthfinders in court. See *State v. Webber*, 260 Kan. 263, 276, 918 P.2d 609 (1996), *cert. denied* 519 U.S. 1090 (1997).

Wakefield argues that the Kansas Supreme Court should reconsider its position on the admission of polygraph test results because other jurisdictions have recently allowed admission of polygraph evidence, without a stipulation by the parties. For authority, Wake-

field cites *United States v. Piccinonna,* 885 F.2d 1529 (11th Cir. 1989), and *State v. Dorsey,* 88 N.M. 184, 539 P.2d 204 (1975).

*Piccinonna* does not support Wakefield's assertion. Although *Piccinonna* recognized the increasing acceptance of polygraph testing as a useful and reliable scientific tool, the case set out narrow parameters for its admission as evidence in court:

"There is no question that in recent years polograph testing has gained increasingly widespread acceptance as a useful and reliable scientific tool. Because of the advances that have been achieved in the field which have led to the greater use of polygraph examination, coupled with a lack of evidence that juries are unduly swayed by polygraph evidence, we agree with those courts which have found that a per se rule disallowing polygraph evidence is no longer warrented. Of course, polygraphy is a developing and inexact science, and we continue to believe it inappropriate to allow the admission of polygraph evidence in all situations in which more proven types of expert testimony are allowed. However, as Justice Potter Stewart wrote, 'any rule that impedes the discovery of truth in a court of law impedes as well the doing of justice.' *Hawkins v. United States,* 358 U.S. 74, 81, 79 S. Ct. 136, 140, 3 L. Ed. 2d 125 (1958) (concurring). Thus, we believe the best approach in this area is one which balances the need to admit all relevant and reliable evidence against the danger that the admission of the evidence for a given purpose will be unfairly prejudicial. Accordingly we outline two instances where polygraph evidence may be admitted at trial, which we believe achieve the necessary balance.

"A. Stipulation

"The first rule governing admissibility of polygraph evidence is one easily applied. Polygraph expert testimony will be admissible in this circuit when both parties stipulate in advance as to the circumstances of the test and as to the scope of its admissibility. The stipulation as to circumstances must indicate that the parties agree on material matters such as the manner in which the test is conducted, the nature of the questions asked, and the identity of the examiner adminstering the test. The stipulation as to scope of admissibility must indicate the purposes for which the evidence will be introduced. Where the parties agree to both of these conditions in advance of the polygraph test, evidence of the test results is admissible.

"B. Impeachment or Corroboration

"The second situation in which polygraph evidence may be admitted is when used to impeach or corroborate the testimony of a witness at trial. Admission of polygraph evidence for these purposes is subject to three preliminary conditions. First, the party planning to use the evidence at trial must provide adequate notice to the opposing party that the expert testimony will be offered. Second, polygraph expert testimony by a party will be admissible only if the opposing party was given reasonable opportunity to have its own polygraph expert administer a test covering

substantially the same question. Failure to provide adequate notice or reasonable opportunity for the opposing side to administer its own test is proper grounds for exclusion of the evidence.

"Finally, whether used to corroborate or impeach, the admissibility of the polygraph administrator's testimony will be governed by the Federal Rules of Evidence for the admissibility of corroboration or impeachment testimony. For example, Rule 608 limits the use of opinion or reputation evidence to establish the credibility of a witness in the following way: '[E]vidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.' Thus, evidence that a witness passed a polygraph examination, used to corroborate that witness's in-court testimony, would not be admissible under Rule 608 unless or until the credibility of that witness were first attacked. Even where the above three conditions are met, admission of polygraph evidence for impeachment or corroboration purposes is left entirely to the discretion of the trial judge." 885 F.2d at 1535-36.

Applying the rationale of *Piccinonna*, Wakefield's polygraph results would not have been admissible because there was no stipulation regarding admission of the polygraph results and there was no attack by the State on Wakefield's claim that Scott was the shooter.

In *United States v. Scheffer*, 523 U.S. 303, 140 L. Ed. 2d 413, 118 S. Ct. 1261 (1998), the United States Supreme Court reconsidered the issue of the admissibility of polygraph test results in criminal trials. Applying the *Daubert* test for judging the admissibility of scientific evidence, the Court determined that there is simply no consensus that polygraph evidence is reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993). The Supreme Court noted that although the degree of reliability of polygraph evidence may depend upon a variety of identifiable factors, there is simply no way to know in a particular case whether a polygraph examiner's conclusion is accurate, because certain doubts and uncertainties plague even the best polygraph exams.

The State of New Mexico is unique in making polygraph evidence generally admissible without a prior stipulation of the parties or without significant restrictions. Notwithstanding New Mexico, state and federal courts generally continue to express doubt about whether such evidence is reliable. 140 L. Ed. 2d at 420-21.

Kansas is among those jurisdictions where doubt still exists as to the reliability of polygraph examinations. In *Webber,* 260 Kan. 263, this court reiterated its longstanding position on the admission of polygraph test results and concluded that polygraph tests are too unreliable to be admissible and they tend to invade the province of the jury in determining the ultimate question of fact: whether a witness is speaking the truth. Clearly, the trial judge did not err in denying Wakefield's motion to admit the polygraph test results.

## PREMEDITATED MURDER

Wakefield contends that the verdict, when read with the instructions, is ambiguous as to whether the jury unanimously found him guilty of premeditated first-degree murder. For authority, Wakefield relies on *State v. Vontress,* 266 Kan. 248, 264, 970 P.2d 42 (1998), where this court held that if the sentencing court cannot ascertain whether the jury unanimously convicted the defendant of both premeditated murder and felony murder, the sentencing court has no authority for sentencing the defendant for premeditated murder.

First-degree premeditated murder is the intentional and premeditated killing of a human being. K.S.A. 21-3401(a). "Intentional" means conduct that is purposeful and willful, not accidental. PIK Crim. 3d 56.04(d) (1994 Supp.). "Premeditation" means to have thought over the matter beforehand. PIK Crim. 3d 56.04(b) (1994 Supp.). Felony murder, on the other hand, is murder committed during the commission of an inherently dangerous felony. The ostensible purpose of the felony-murder doctrine is to deter those engaged in dangerous felonies from killing negligently or accidently. *Vontress,* 266 Kan. at 263.

The jury instructions in this case required that the jury consider first-degree premeditated murder, first-degree felony murder, and first-degree murder on the combined theories of premeditated murder and felony murder. Jury instruction No. 10 stated:

"Where evidence is presented on the two alternate theories of proving the crime charged, you must consider both in arriving at your verdict.

"In Instructions 6 and 8, the Court has set out for your consideration the essential claims which must be proved by the State before you may find the defendant guilty of premeditated murder.

"In Instructions 7 and 9, the Court has set out for your consideration the essential claims which must be proved by the State before you may find the defendant guilty of felony murder, that is the killing of a person in the commission of an aggravated burglary.

"If you do not have a reasonable doubt from all the evidence that the State has proven murder in the first degree on either or both theories, then you will enter a verdict of guilty on either or both theories. If you are unable to unanimously agree on either theory, but you each agree that the State has proven murder in the first degree on one of the two theories, you will enter a verdict of guilty on the combined theories of premeditated murder and felony murder.

"If you have a reasonable doubt as to the guilt of the defendant as to the crime of murder in the first degree on both theories, then you must enter a verdict of not guilty."

According to the jury instructions, the jury was to find Wakefield guilty of first-degree murder on the combined theories of premeditated and felony murder only if it found Wakefield guilty of first-degree murder but was unable to unanimously agree on either premeditated or felony murder. On the verdict form and when polled by the trial judge to determine if the verdict was correct, the jury indicated unanimous agreement as to premeditated murder and as to felony murder, yet it also indicated, by selecting the combined theory option, that it could not reach a unanimous agreement on those theories.

First, we note that the jury verdict is inconsistent with the instructions, and, more importantly, the district judge, when drafting the jury instructions failed to recognize that the instructions as written were no longer valid due to a change in the sentencing law. Prior to 1994, it was of no consequence if the jury found the accused guilty of first-degree premeditated murder, first-degree felony murder, or the combined theories of first-degree premeditated and felony murder. Under either theory of first-degree murder, there was one sentence option, *i.e.*, life imprisonment with eligibility for parole after 15 years. See K.S.A. 1993 Supp. 22-3717. In 1994 the Kansas Legislature amended the sentencing statutes to provide a different sentencing structure based on whether the defendant was convicted of premeditated murder or felony murder. Pursuant to the post-1994 statutes, a defendant convicted of first-degree felony murder is eligible for parole after serving 15 years

of a life sentence. K.S.A. 21-4706(c). However, there are several harsher sentencing options available where the defendant has been convicted of premeditated murder. The defendant may receive the death penalty, a hard 40 sentence, or a hard 25 sentence. See K.S.A. 21-4624(a); K.S.A. 21-4635(a); K.S.A. 22-3717(b)(1). The judge's instructions to the jury and the verdict form allowing a verdict on the combined first-degree murder theories were erroneously based on the law prior to the 1994 change in the sentencing statutes. Furthermore, the judge was unaware that the jury had failed to follow the instruction to select the combined theory option only if it failed to agree unanimously on a theory.

In *Vontress*, a somewhat similar circumstance occurred. Vontress was convicted of first-degree premeditated murder, felony murder, aggravated robbery, aggravated battery, and criminal possession of a firearm. Vontress appealed his convictions and sentences. One of the issues raised in *Vontress* was whether the trial court erred in not setting aside the conviction and sentence for premeditated first-degree murder because the jury had also found Vontress guilty of felony murder.

The jury was instructed in *Vontress* that the State had introduced evidence on the two alternate theories of first-degree murder. The instruction provided:

" 'Where evidence is presented on the two alternate theories of proving the crime charged, you must consider both in arriving at you verdict.

. . . .

" 'If you do not have a reasonable doubt from all of the evidence that the State has proven murder in the first degree on either or both theories, then you will enter a verdict of guilty.' " 266 Kan. at 261.

The jury in *Vontress* was further instructed:

" 'If you find the defendant is guilty of murder in the first degree, the Presiding Juror shall sign the applicable verdict form and, in addition, you shall then determine the alternative theory or theories contained in "Theory 1A [premeditated murder]," "Theory 1B [felony murder]" or "Theory 1C [the combined theories of premeditated murder and felony murder]." The Presiding Juror shall sign the applicable alternative Theory Verdict form.

" 'If you have a reasonable doubt as the guilt of the defendant as to the crime of murder in the first degree on both theories, then you must enter a verdict of not guilty.' " 266 Kan. at 261.

The verdict form had signature lines for each of the enumerated options. The presiding juror signed under option 1, indicating the jury unanimously found Vontress guilty of murder in the first degree. The presiding juror also signed on the signature lines under theory 1(A) and theory 1(B), indicating unanimous agreement that Vontress was guilty of both first-degree premeditated murder and first-degree felony murder.

The court sentenced Vontress for premeditated first-degree murder. On appeal Vontress contended that because the jury had not elected between the two theories of first-degree murder, his mandatory 40-year prison term for premeditated murder was an illegal sentence; therefore, his conviction must be reversed.

The *Vontress* court observed that as stated in the statute, premeditated murder and felony murder were separate and distinct offenses, even though the death of an individual is an element necessary to prove each of the crimes. The *Vontress* court then noted that although first-degree premeditated murder and first-degree felony murder require different types of proof, under certain circumstances prior to 1990, the accused could be charged with and convicted of both types of first-degree murder. 266 Kan. at 262 (citing *State v. Thompkins*, 263 Kan. 602, 609, 952 P.2d 1332 [1998]).

In *Thompkins*, it was pointed out that when an information charges the defendant with premeditated murder and felony murder for the commission of a single homicide, and the State introduces evidence on both theories at the trial, the trial court should instruct the jury on both theories in the alternative in order to avoid confusing the jury. 263 Kan. at 609-10.

The *Vontress* court discussed *State v. Kingsley*, 252 Kan. 761, 851 P.2d 370 (1993), *modified by State v. Willis*, 254 Kan. 119, 864 P.2d 1198 (1993), where Kingsley had contended that his mandatory 40-year sentence should be vacated on the ground that the jury's verdict of first-degree premeditated murder may not have been unanimous. The jury in *Kingsley* had rendered a unanimous verdict of guilt regarding both the premeditated and felony-murder theories. Kingsley had argued that the verdict form and the instructions gave rise to the possibility that all the jurors agreed that he

committed first-degree murder, but some based their finding on evidence supporting one theory and others based their finding on evidence supporting the alternative theory. 252 Kan. at 785.

In rejecting the defendant's contention, the *Kingsley* court relied, in part, on a case decided prior to the enactment of the hard 40 sentencing statute, *State v. Hartfield*, 245 Kan. 431, 781 P.2d 1050 (1989). In *Hartfield*, this court reaffirmed a rule set out in *State v. Wilson*, 220 Kan. 341, 345, 552 P.2d 931 (1976), *overruled on other grounds State v. Quick*, 226 Kan. 308, 317, 597 P.2d 1108 (1979), that it matters not whether some of the jury arrive at the verdict of guilty based on premeditation while others rely on felony murder for the verdict. 245 Kan. at 447.

*Thompkins* and the cited cases in *Kingsley* were decided based on the sentencing statutes prior to the 1994 amendments. Because at that time the same penalty was imposed for conviction under either theory of first-degree murder, it was of no consequence whether the jury found the defendant guilty of premeditated murder or felony murder.

The *Thompkins* court stated that where a defendant, who, prior to committing a robbery, intended to kill the victim, committed the robbery and killed the victim, the defendant may be convicted of each type of first-degree murder. It pointed out this was one of the possible correct results because, regardless of the finding of guilt under either theory, the defendant could be sentenced to life for only one act of first-degree murder. 263 Kan. at 610.

The *Vontress* court noted that statutorily the mandatory 40-year sentencing option is available only where the defendant has been convicted of premeditated first-degree murder; it is not available where the defendant has been convicted of felony murder. Therefore, the sentencing judge would be precluded from imposing the hard 40 sentence where the jury was unable to reach a unanimous verdict as to the premeditation theory. Where the sentencing court cannot ascertain whether the jury unanimously convicted the defendant of both premeditated murder and felony murder, but the jury convicted the defendant of the inherently dangerous underlying felony, the sentencing court may not sentence the defendant

for premeditated murder but must impose the sentence for felony murder. 266 Kan. at 264.

The *Vontress* court found the instructions and the verdict form clearly informed the jury that a unanimous verdict was required for a conviction under either or both theories of guilt. The jury had unanimously found Vontress guilty of premeditated murder and felony murder. The *Vontress* court concluded that under the circumstances, Vontress' sentence for premeditated murder is not illegal. 266 Kan. at 264.

Here, the evidence supports a verdict of first-degree premeditated murder against Wakefield as an aider and abetter and a verdict of first-degree felony murder. Although the instructions required the jury to select a verdict on the combined theories only if it could not unanimously agree on one theory, the jury instructions and the verdict form clearly informed the jury that a unanimous verdict was required for a conviction under any or all theories of guilt. Following the judge's instruction, the jury first unanimously found Wakefield guilty of premeditated murder and then unanimously found Wakefield guilty of felony murder prior to finding Wakefield guilty on the combined theories. There is no question, therefore, that the jury first unanimously found Wakefield guilty of premeditated murder. Under the circumstances, Wakefield's convictions and sentences for premeditated murder is not illegal.

## HARD 40 SENTENCE

Wakefield asserts that a defendant convicted of aiding and abetting a premeditated murder cannot be sentenced to the hard 40 term of imprisonment. This question involves an interpretation of K.S.A. 21-4635 and K.S.A. 21-4636. Interpretation of a statute is a question of law, and this court's review is unlimited. *Hamilton v. State Farm Fire & Cas. Co.*, 263 Kan. 875, 879, 953 P.2d 1027 (1998).

K.S.A. 21-4635 provides that if a defendant is convicted of first-degree premeditated murder, the court shall determine whether the defendant shall be required to serve a mandatory term of imprisonment of 40 years. In order to make such a determination,

the sentencing judge considers certain statutorily defined aggravating and mitigating circumstances. See K.S.A. 21-4636; K.S.A. 21-4637. Here, as an aggravating factor the sentencing judge relied on the fact that the defendant knowingly or purposely killed or created a great risk of death to more than one person. K.S.A. 21-4636(b).

Wakefield argues that to consider the aggravating circumstances under K.S.A. 21-4636 for the hard 40 sentence, the individual to be sentenced must have actually committed the killings. To support his argument Wakefield relies on death penalty cases from other jurisdictions which had found that an aider and abetter cannot be sentenced to the hard 40 sentence.

First, this court has held that death penalty cases from other jurisdictions have limited precedential value for hard 40 sentencing. See *State v. Spain*, 263 Kan. 708, 709, 953 P.2d 1004 (1998). Wakefield also ignores the language in the statute providing that the aggravating factor applies to a defendant who "created a great risk of death to more than one person." K.S.A. 21-4636(b). Clearly, Wakefield's convictions support this aggravating factor.

Mere association with the principals who actually commit the crime or mere presence in the vicinity of the crime are themselves insufficient to establish guilt as an aider and abettor; however, when a person knowingly associates himself or herself with the unlawful venture and participates in a way which indicates he or she willfully is furthering success of the venture, such evidence of guilt is sufficient. K.S.A. 21-3205(1). Any person who counsels, aids, or abets in the commission of any offense may be charged, tried, convicted, and sentenced in the same manner as if he or she were a principal. *State v. Nguyen*, 251 Kan. 69, 85, 833 P.2d 937 (1992). The fact that Wakefield was found guilty of first-degree premeditated murder as an aider and abetter has no bearing on whether he can be sentenced to the hard 40 term of imprisonment.

Affirmed.

ALLEGRUCCI, J., concurring and dissenting: I dissent from the majority's affirming the defendant's conviction of first-degree premeditated murder. Here, the trial judge improperly instructed the

jury that it could find the defendant guilty of first-degree murder based upon the combined theories of premeditated and felony murder. In addition, the trial judge refused to use the approved PIK jury form that would have prevented the confusion of what was the jury's verdict.

I disagree with the majority that, notwithstanding the improper instruction and confusing jury verdict form, there is no question that the jury unanimously found the defendant guilty of premeditated murder. There is no question, in my opinion, that the verdict is ambiguous. The jury could just as easily have interpreted the judge's instruction to mean that if it found any one of the alternatives, then defendant was guilty of premeditated first-degree murder. The jury's verdict indicated it unanimously found the defendant guilty of premeditated murder and felony murder, but also, by marking the combined theory option, indicated that it could not reach a unanimous finding on premeditated and felony murder. Under these circumstances, it is pure speculation as to what the jury meant by marking all three alternatives on the verdict form. All the trial judge had to do was ask the jurors to explain why all three alternatives were marked or whether each juror agreed that the defendant was guilty of premeditated murder. Instead, the judge polled the jury only as to whether the verdict was correct. The verdict clearly is inconsistent and defective, and where that is the case, the trial court has no authority to sentence the defendant for premeditated first-degree murder. *State v. Vontress*, 266 Kan. 248, 264, 970 P.2d 42 (1998). I would reverse the defendant's conviction of premeditated first-degree murder; affirm the defendant's convictions of felony murder, aggravated burglary, and felony theft; vacate the sentences; and remand for resentencing.